**HAWAII'S THOUSAND FRIENDS**, a Non–Profit Corporation, Plaintiff–Appellee, Cross–Appellant, v. **D.G. "ANDY" ANDERSON**, Managing Director of the City and County of Honolulu; **FRANK F. FASI**, Mayor of the City of Honolulu; **ALVIN K. H. PANG**, Director, Department of Housing and Community Development, City of Honolulu, Defendants–Appellants, Cross–Appellees, and **CITY AND COUNTY OF HONOLULU** and **RIZALINO VICENTE**, Director of Finance For the City of Honolulu, Defendants–Appellees, Cross–Appellees, and **JOHN DOES 1–10** and **DOE CORPORATIONS 1–10**, Defendants

NO. 12554

(CIV. NO. 86–1810)

FEBRUARY 16, 1989

NAKAMURA, ACTING C.J., PADGETT, HAYASHI, AND WAKATSUKI, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS IN PLACE OF LUM, C.J., RECUSED

OPINION OF THE COURT BY WAKATSUKI, J.

In 1985 Mayor Frank Fasi directed his administration to embark on a study of available locations in central Oahu for a city–developed housing project pursuant to authority granted by the legislature in Hawaii Revised Statutes (HRS) § 359G–4.1 and § 46–15.1. By January 1986, the administration had identified the Waiola Estate lands as ideal for the proposed housing development.

Negotiations with the owners for acquisition of the land were carried on and resulted in a letter of understanding.

In February, 1986, Alvin Pang, then the director of the City's Department of Housing and Community Development, and D.G. "Andy" Anderson, then the City's Managing Director, orally contracted with Park

Engineering, Inc. to conduct an engineering and environmental feasibility study of the Waiola site. Another oral contract was entered into with Loomis and Pollack, Inc. to conduct a market assessment and advertising campaign for the proposed development.

The City Council was briefed on the Administration's proposal for the Waiola project on April 4, 1986 by Anderson and Pang. There was no disclosure at that time, however, of the impending advertising campaign.

A series of print, radio, and television advertisements on the Waiola project were run on April 9, 1986. The newspaper advertisement basically described the proposed project and eligibility requirements for prospective home buyers. One section of the ad touted Anderson's efforts in this project. The ad further stated that a drawing would determine the order of eligible purchasers, but that the "actual date for the drawing cannot be set until the City Council takes action to approve the project and its initial funding." Finally, the ad contained an "application form" to be clipped out and mailed to the City's housing department.

A notice soliciting bids on the Waiola project from licensed contractors was published on April 20, 1986. In early May, 1986, the oral contracts previously entered into with Park Engineering and Loomis and Pollack were reduced to writing.

Formal submission of the proposed project to the City Council was made on April 21, 1986. Five weeks later, the Council conditionally approved the Waiola project, subject to, *inter alia*, the preparation of an environmental impact statement and a change in the land use classification by the State Land Use Commission (LUC).

Pursuant to these conditions imposed by the Council, the City entered into a number of written contracts for professional services. Moneys to finance these contracts, as well as the Park Engineering and Loomis and Pollack contracts, came from either the City's Housing Assistance Fund or federal section 8 housing funds available to the City.

Upon seeing the April 9, 1986 advertisement in the newspaper, Hawaii's Thousand Friends (HTF), a non–profit corporation, began an investigation into the Waiola project. The HTF board of directors was initially concerned that the proposed project was to be situated on land which was designated as agricultural in the State Development Plan. After HTF member Mark Wilson met with Anderson and expressed HTF's concern, HTF filed this suit on May 13, 1986.

HTF's original complaint included allegations that the proposed development of Waiola Estates on agricultural land was in contravention of our State constitutional provision promoting the preservation of agricultural lands. After the original complaint was filed, the LUC rejected the City's application to reclassify the lands in question from agricultural to urban use, thereby making that allegation moot.

The case was eventually tried on the third amended complaint which alleged, *inter alia*, that (1) defendants conspired to place public ads for the Waiola project solely to promote Anderson's political goals, thereby committing a fraudulent use of public funds; (2) defendants made numerous misrepresentations in the advertisements; and (3) defendants violated the public bidding requirements in executing the contract with Park Engineering. According to the complaint, the injury sustained by HTF was the "unlawful depletion of the City and County of Honolulu cash assets held in public trust." It prayed for relief in the form of (1) a declaration that HRS § 359G–4.1 and § 46–15.1 are unconstitutional and, therefore, cannot be used as a shield by defendants; (2) an injunction barring defendants from taking any further action on the Waiola project; and (3) general damages to be paid directly to the City treasury in the amount of the public funds used to finance the Waiola project.

Defendants filed a motion for partial summary judgment on the ground that HTF lacked standing. The motion was denied and the case was tried before a jury.

Throughout the trial, HTF's theory was that the defendants were defrauding the citizens in general and fraudulently using public funds for non–public purposes. Consequently, HTF presented no evidence that it was defrauded personally or damaged individually by defendants' acts. Counsel for HTF repeatedly stated that HTF did not seek any monies for itself. Rather, HTF wanted defendants to repay the monies used on the Waiola project to the City treasury. Despite this insistence by HTF, at the close of trial the jury was instructed only as to private fraud, and not governmental fraud. Also, the special verdict form submitted to the jury asked only whether HTF personally and individually was defrauded, and, if so, the amount of damages HTF suffered.

The jury returned a verdict finding that the defendants defrauded HTF and awarded to HTF the sum of $482,921. After the jury had been discharged, HTF asked that the judgment reflect that the damages awarded were to be paid to the City treasury rather than to HTF. The trial

court opined that that would constitute an amendment to the jury's verdict which it was without authority to do. Therefore, judgment in conformance with the jury verdict awarding damages to HTF was entered on October 1, 1986.

On appeal, defendants raise a host of issues. Two of those issues are dispositive of this case. We, therefore, limit our discussion to (1) HTF's standing, and (2) the sufficiency of the evidence to sustain the jury verdict.

We reverse and remand for entry of dismissal of the complaint.

## I.

Prior to the commencement of trial, defendants moved for summary judgment on the ground that HTF lacked standing to bring this suit. Determining that questions of material facts existed, the court denied the motion. At trial, defendants moved for directed verdict on the same ground. Again the motion was denied.

HTF asserts that it is a proper plaintiff based on three alternative theories: (1) taxpayer standing, (2) environmental/public interest standing, and (3) private attorney general.

In determining whether HTF has standing, we look solely to whether HTF is the proper plaintiff in this case, without regard to the merits of the allegations.

We hold that HTF did not have standing and the complaint should have been dismissed.

## A.

Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated. And the crucial inquiry in its determination is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of . . . [the court's] jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Warth v. Seldin*, 422 U.S. at 498–99 (original emphasis).

*Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 172, 623 P.2d 431, 438 (1981).

"The right to maintain [an action to question illegal expenditures by a public agency] is based upon the taxpayer's equitable ownership of such funds and his liability to replenish the public treasury for the deficiencies caused by the misappropriation." *Smith v. Graham County Community College Dist.*, 123 Ariz. 431, 432–33, 600 P.2d 44, 45–46 (Ariz. App. 1979). *See also Wilson v. Stainback*, 39 Haw. 57, 71 (1951). The taxpayer must show that he has sustained or will sustain pecuniary loss by the increase of the burden of taxation. *Munoz v. Commissioner of Pub. Lands*, 40 Haw. 675, 682 (1955). He must, therefore, be a contributor to the particular fund from which public monies are or will be expended. *Smith*, 123 Ariz. at 433, 600 P.2d at 46.

Where fraud exists, however, we have relaxed the burden on the taxpayer of proving pecuniary loss. The taxpayer need not show that his tax burden will be increased as a result of the fraud, for we have held that "the fraudulent act is considered tantamount to a waste of public funds thereby vesting a taxpayer with sufficient pecuniary interest[.]" *Munoz*, 40 Haw. at 682.

Two requirements, then, must be met for taxpayer standing: (1) plaintiff must be a taxpayer who contributes to the particular fund from which the illegal expeditures are allegedly made; and (2) plaintiff must suffer a pecuniary loss, which, in cases of fraud, are presumed.

On the motion for summary judgment, the circuit court decided that factual questions existed as to whether there was fraud. Being unable to make a determination as to the second requirement for taxpayer standing the court denied the motion for summary judgment.

Regardless of the factual questions posed in the second requirement, plaintiff must also satisfy the first requirement. HTF is a non–profit, tax–exempt membership corporation. It is not assessed any real property taxes. The excise, gasoline, and employment taxes which HTF claims it "pays" are not assessed against HTF and/or do not go into the particular funds from which illegal expenditures were allegedly made. HTF, having failed to meet the first requirement, could not maintain an action as a taxpayer.

## B.

This court liberalized the rules pertaining to standing beyond taxpayer actions in *Akau v. Olomana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982). In *Akau*, the court held "that a member of the public has standing to sue to enforce the rights of the public even though his injury is not different in kind from the public's generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." *Id.* at 388–389, 652 P.2d at 1134.

Injury in fact requires a showing by the plaintiff that (1) he suffered actual or threatened injury as a result of defendant's conduct; (2) the injury is traceable to the challenged action; and (3) the injury is likely to be remedied by a favorable judicial decision. *Akau*, 65 Haw. at 389, 652 P.2d at 1134–35.

HTF alleges that it suffered three types of injury as a result of defendants' actions. First, because of the illegal use of public moneys, those moneys are not available for environmental studies and/or other low–and moderate–income housing developments. This asserted injury can be viewed in two ways, neither of which would give HTF standing: (a) it could be interpreted to mean that in order to conduct environmental studies and other housing developments, additional funds would have to be found to pay for them; and (b) that HTF's political priorities—environmental studies and other housing developments funded through governmental expenditures—would not be addressed. By such an assertion, HTF is "seek[ing] to do no more than vindicate [its] own value preferences through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972).

In *Sierra Club v. Morton*, supra, the United States Supreme Court did not doubt Sierra Club's genuine interest in the issue presented in the lawsuit. But unless it could show some concrete injury, Sierra Club was merely asserting a "value preference" and not a legal right. The proper forum for the vindication of a value preference is in the legislature, the executive, or administrative agencies, and not the judiciary. For it is in the political arena that the various interests compete for legal recognition.

HTF's second claim that it was compelled to investigate defendants' illegal conduct, and in doing so expended its own funds, is also a use of the judicial process to vindicate HTF's value preferences.

In *Sierra Club v. Morton*, the Supreme Court explained why a special interest in the problem, by itself, would not be sufficient to confer standing.

> [I]f a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short–lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

*Sierra Club v. Morton*, 405 U.S. at 739–40.

Were we to recognize HTF's investigation expenditures as injury in fact sufficient to confer standing, any interest group or individual could initiate special interest litigation merely by incurring expenses connected therewith. We abhor the use of courtrooms as political forums to vindicate individual value preferences.

Third, HTF alleges that some of its members who may qualify for low– and moderate–income housing were misled by the ads and suffered injury thereby. This suit, however, is brought by HTF, the corporation, not by the members of HTF individually.

We have in the past recognized suits brought by non–profit organizations on behalf of their membership. *See, e.g., Waianae Model Neighborhood Area Ass'n v. City & County*, 55 Haw. 40, 514 P.2d 861 (1973). In those cases, however, the injury alleged by the organization was suffered by the membership in general. More importantly, the remedy which could be provided to the organization by a favorable judicial decision would also remedy the injury suffered by the members individually.

The situation in this case is different. The injury arising out of the misrepresentation is not alleged to have been suffered by the HTF membership in general. Rather, very few of HTF's members were injured in this way. The injury suffered by these few is a very personalized injury. Each member who claims to have been misled would have undertaken different actions upon reliance on the misrepresentation. The resultant

injury, therefore, would be different for each person. Moreover, the remedy which could be awarded to the HTF organization would not compensate each of the members who incurred personal damages as a result of defendants' misrepresentations.

## C.

Finally, HTF asserts it has standing to bring this suit as a private attorney general. As support for this theory, HTF, in its briefs, quotes from *Sierra Club v. Morton*, 405 U.S. at 737:

> [T]he fact of economic injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate.

HTF misconstrues this statement. Economic injury gives standing and not the "public interest" as HTF argues. And only one who already has standing can argue the public interest in support of his claim. This is made clear by the statement following the above quoted language in *Sierra Club v. Morton*. The Supreme Court went on to say:

> It is in a similar sense that we have used the phrase "private attorney general" to describe the function performed by *persons upon whom Congress has conferred the right to seek judicial review* of agency action. [Emphasis added.]

*Id.* at 737–38.

HTF cites no authority from any legislative body giving HTF the right to seek judicial review in this instance.

## II.

Ordinarily, a determination that the plaintiff lacks standing would be dispositive of the entire case on appeal. However, a strange and unexplained twist in this case forces us to discuss a second issue to ensure complete disposition of this appeal.

The complaint alleged and trial proceeded upon the theory that defendants defrauded the citizens in general and fraudulently used public funds for non–public purposes. Yet the jury's special verdict was that

HTF was personally defrauded. Since HTF had standing to pursue a private fraud claim, the question then is whether there was sufficient evidence to uphold that verdict.

HTF's complaint did not allege that HTF itself was defrauded by defendants' actions, nor was this theory ever proposed by HTF during the course of the lengthy trial. In fact, the evidence revealed that soon after defendants' advertising campaign began, HTF commenced investigations due to its suspicions that defendants were engaging in fraudulent conduct. The jury was often reminded by HTF's counsel that HTF did not seek any monetary award for itself. Besides, HTF did not attempt to adduce any evidence of pecuniary loss to itself.

Nevertheless, the jury was instructed only as to fraud upon HTF personally, and not as to fraud upon the public in general. Furthermore, the trial court submitted to the jury a special verdict form prepared by HTF asking only whether HTF was personally defrauded by defendants and what damages, if any, HTF suffered.

The evidence must be clear and convincing to support a finding of fraud. *See Dobison v. Bank of Haw.*, 60 Haw. 225, 226, 587 P.2d 1234, 1235 (1978) (per curiam). The evidence must show that (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them. *Kang v. Harrington*, 59 Haw. 652, 656, 587 P.2d 285, 289 (1978). Further, plaintiff must show that he suffered substantial pecuniary damage for "[t]he aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded." *Ellis v. Crockett*, 51 Haw. 45, 52, 451 P.2d 814, 820 (1969).

The record in this case indicates that HTF was immediately suspicious of the representations made in defendants' advertising campaign. There is no evidence indicating that HTF relied on defendants' representations, nor any evidence to show that HTF suffered any pecuniary damages as a result of defendants' misrepresentations.

We find from the record insufficient evidence to support the jury's verdict.

## III.

The verdict is reversed, the award vacated, and this case is remanded for dismissal of the complaint.

*William C. McCorriston* (*James J. Bickerton* with him on the briefs of Goodsill Anderson Quinn & Stifel) for Defendant–Appellant and Cross–Appellee Frank F. Fasi.

*Boyce R. Brown, Jr.* (*Brian R. Jenkins* and *Lynn Merrick* with him on the briefs) for Appellant–Defendant D.G. "Andy" Anderson.

*Burnham H. Greeley* (*Christine E. Kuriyama* with him on the briefs of Greeley, Walker & Kowen) for Defendant–Appellant/Cross–Appellee Alvin K. H. Pang.

*Martin Wolff* for Plaintiff–Appellee Hawaii's Thousand Friends.