956 F.2d 1167
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Arthur S. KATAYAMA, Plaintiff-Appellant/Cross-Appellee,
v.
HELLER-WHITE HOTELS COMPANY, INC.; Ilikai Hotel Investors
Limited Partnership; Mitchell T. Heller, individually and
in his capacity as General Partner of Ilikai Hotel Investors
Limited Partnership and in his capacity as President of
Heller-White Hotels Company, Inc.; Heller-White Hawaii
Corporation, Defendants-Appellees/Cross-Appellant
 No. 90-16596, 90-16673.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 16, 1992.
Decided March 5, 1992.
 
 1
 Before SCHROEDER and T.G. NELSON, Circuit Judges, CALLISTER,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Plaintiff, Arthur S. Katayama ("Katayama"), a California attorney, appeals the district court's decision following a bench trial in favor of Phoenix-based Defendants Heller-White Hotels Company, Ilikai Hotel Investors Limited Partnership, Heller-White Hawaii Corporation and Mitchell T. Heller, individually and in his capacity as General Partner of Ilikai Hotel Investors Limited Partnership and as President of Heller-White Hotels Company. Hereinafter the Defendants are cumulatively referred to as "Heller".
 
 
 4
 The district court rejected Katayama's claim that Heller breached a contract to pay Katayama a $2.1 million "finders fee" for finding Heller a buyer of the Ilikai Hotel in Honolulu, Hawaii.
 
 
 5
 Heller cross-appeals the district court's judgment in favor of Katayama on Heller's counterclaim that Katayama fraudulently induced Heller to rely on Katayama's guaranteed net recovery to Defendants.
 
 
 6
 We AFFIRM the district court's decision denying Katayama's breach of contract claim, and REMAND the court's decision denying Heller's counterclaim for more specific findings as to the reasons for its conclusions that there was no reasonable reliance on Katayama's misrepresentations, that the damages were too speculative, and that Katayama's misrepresentations were not the proximate cause of any damages.
 
 STATEMENT OF FACTS & PROCEDURAL HISTORY
 A. The District Court's Findings of Fact
 
 7
 In 1984, Defendants Ilikai Hotel Investors Limited Partnership ("IHI") and Heller (who is a general partner of IHI) contracted with the Westin Hotel Corporation to purchase the Ilikai Hotel. (District Court's Findings of Fact ("FF") 9) Legal disputes between Westin and Heller over the terms of the contract led to a settlement whereby IHI had the right to purchase the Ilikai at $54 million provided that the purchase was completed by March 2, 1987. (FF 12)
 
 
 8
 Heller sought financing to facilitate the purchase. He contracted with James Covella ("Covella") as his exclusive agent to find mortgage financing, joint ventures or potential purchasers. (FF 17, 31)
 
 
 9
 One potential source of financing was a joint venture with Mr. Gotoh, a Japanese national. (FF 15) It was during the Gotoh negotiations that Heller first had dealings with Katayama. Katayama was the attorney for Gotoh during the negotiations, as well as the attorney for Gotoh's broker and interpreter, Tadashige Oku ("Oku"). (FF 17-21, 26) Katayama did not reveal to Heller that he had an attorney-client relationship with Gotoh or Oku, rather he held himself out to be an expert on Japanese business protocol. (FF 20, 25)
 
 
 10
 Based on Katayama's revelation that Gotoh was dealing in bad faith, Heller followed Katayama's advice to terminate negotiations with Gotoh. (FF 29-30) Heller was unaware until pre-trial discovery in the present case that Katayama was Gotoh's attorney, and that Katayama was thereby breaching his fiduciary duty to Gotoh by advising Heller to terminate negotiations. (FF 20)
 
 
 11
 During the fall of 1986, Heller and Covella actively sought out and negotiated with various potential lenders. (FF 32) Katayama frequently asked about the progress of these negotiations indicating that he had Japanese contacts who were interested in acquiring property in Hawaii. (FF 32-33) Heller and Covella trusted Katayama because of the confidential advice he gave during the Gotoh negotiations, his apparent expertise in dealing with Japanese businessmen, and other favorable business dealings he had with Covella. (FF 33) Consequently, when Katayama would ask, Covella would confidentially share information as to the progress of negotiations. (FF 33)
 
 
 12
 Katayama knew the urgency of the March 2nd deadline (FF 34) and also knew, from the latter part of 1986, that Heller wanted to get a long-term management agreement on the Ilikai from the new owner which would pay Defendants at least one percent of the gross revenue and ten percent of the operating profits. (FF 60) Heller told Katayama that by "long-term" he meant a 20-year management agreement. (FF 60)
 
 
 13
 Katayama called Heller on September 22, 1986, to say that he had a Japanese buyer who was potentially interested in buying the Ilikai. (FF 36) Katayama requested, and Heller sent, financial information and written authorization to approach the Japanese contacts. (FF 36, 41) At that point, Katayama recruited Oku (and others) to target potential Japanese buyers. Oku understood that if a deal were consummated, Covella, as the exclusive agent, would share the finder's fee with all of them. (FF 42).[1]
 
 
 14
 On November 26, 1986, in response to Oku's request for written evidence of his authority to approach potential buyers, Heller sent a letter reaffirming Covella as the exclusive agent, contemplating a $2 million "brokerage fee" to Covella and his "co-agents, if any." (FF 48) Oku approached the Industrial Bank of Japan ("IBJ"), and in December, 1986, IBJ expressed an interest in buying the Ilikai. (FF 49)
 
 
 15
 On January 19, 1987, Katayama telephoned Heller and told him he had an offer in excess of $80 million that would give the Defendants a net price of $77.5 million and that he would disclose the identity of the purchaser and deliver the offer the following day if Heller would agree to the following terms: (1) Defendants would waive in writing the excess of the purchase price over $77.5 million, as the total price would be $83 to $85 million (Katayama told Heller that this excess amount would be used to pay the necessary individuals in Japan to facilitate the transaction); (2) "from" the $77.5 million net price which Defendants were to receive, Defendants would pay "a commission of $2.1 million" to Oku, Covella, and Katayama, to be shared in roughly equal shares; and (3) Katayama's buyer would have a first right to match any other offer that Defendants received. (FF 52)
 
 
 16
 To induce Heller's agreement, Katayama told him that the Chairman of the Board of the buyer had already made the decision to buy, and that Katayama would present Heller with a written offer the next day if Heller provided a written waiver of the funds in excess of $77.5 million. (FF 53) Heller agreed to the terms, at which point Katayama revealed that the buyer was IBJ. (FF 53)
 
 
 17
 Katayama told Heller that Mr. Ikeura, IBJ's Chairman of the Board, "was personally involved, had blessed this deal and had agreed that Heller/the Defendants would receive a net $77.5 million." (FF 54) Katayama also told Heller that the excess funds were to be paid to people in Japan who wielded considerable influence. In particular, Katayama mentioned Mr. Watanabe, a very wealthy gentleman who had business and political connections, and Watanabe's friend, Mr. Kanemaru, a high-placed official in the Japanese government who was in a position to expedite any transaction that involved large amounts of yen leaving Japan. (FF 54, 27, 57)
 
 
 18
 As per Katayama's request to memorialize the January 19th telephone conversation, on January 20, 1987, Heller federal expressed a letter to Katayama reflecting the agreed terms. (FF 61-62) The letter provides, in pertinent part:
 
 
 19
 If your client tenders an offer to purchase The Ilikai and if the said offer is accepted by our company, we agree that such sums as may be offered us in excess of US $77.5 million are deemed commissions/fees to be disbursed to agents in Japan. We further agree to remit a commission of USS $2.1 million to agents in the United States including Messers. Covella, Oku and yourself, this latter payment to come from the US $77.5 million we are to receive and will be paid at closing.
 
 
 20
 ... We have indicated a willingness to trade the funding of land acquisition and/or retro-fitted life safety system costs for a long term management contract to operate The Ilikai. Absent such an acceptable management contract, we will not agree to fund either of these costs.
 
 
 21
 (Katayama's ER 45)
 
 
 22
 The district court found that the agreement, memorialized by the January 20, 1987, letter, "specifically and unambiguously provided that the 'commission of US $2.1 million' was 'to come from the US $77.5 million we are to receive,' " and that it was the "objective manifestation of the intent of the parties that Plaintiff would have earned ... the commission only if Defendants received a net purchase price of US $77.5 million." (FF 63) The court also found that other terms not included in the January 20th letter were also a part of the agreement, such as IBJ's first right to match another offer. (FF 63)
 
 
 23
 Heller advised the other potential buyers with whom he had been negotiating that he was in serious negotiations with IBJ, and had given IBJ a first right match to any other offers. (FF 106) Upon learning of IBJ's right-to-match, Sampo Land Industrial Co., Ltd. withdrew a proposal to purchase the Ilikai for $80 million. (FF 107)
 
 
 24
 Negotiations took place in Hawaii on January 27, 1987, the parties arriving from Phoenix, California and Japan. On January 26, 1987, the day before negotiations were to begin, Katayama met with Heller, Covella and others to discuss the proper business protocol that should be followed in dealing with the Japanese. They also discussed the distribution of funds in excess of $77.5 million, and Heller's desire for a long term management agreement. Katayama promised to convey Heller's desire to IBJ. (FF 70)
 
 
 25
 Later that evening, Katayama and Oku met with Mr. Shuichiro Tamaki ("Tamaki"), the Director and General Manager of IBJ, to discuss various deal points including the long term management agreement. (FF 71) Tamaki indicated that permitting Heller to retain a management agreement presented a "problem." (FF 72)
 
 
 26
 At the meeting between Heller, Covella, Covella's attorney Terrance Lee ("Lee"), and the IBJ representatives, the Ilikai deal was discussed in general terms, and the IBJ representatives were taken on a tour of the Ilikai which had been arranged by Katayama. (FF 72-76)
 
 
 27
 Shortly after the initial meeting, the IBJ representatives returned to Japan and Katayama returned to California. Heller, Covella and Lee remained in Honolulu. They were in daily contact with Katayama seeking, and receiving, advice as to how to respond to IBJ's offers in a manner which would not cause either side to "lose face" or break off negotiations. (FF 77-80)
 
 
 28
 On February 3, 1987, Terry Lee's office received a fax from IBJ offering $70 million. In a phone call to Katayama the next day, Heller expressed concern that the offer was far below the $83-85 million Katayama had said was needed to pay the people in Japan to make the transaction work. (FF 85-86) Katayama advised Heller not to make a counter-offer of $75 million, as Heller was inclined to do, but rather counter-offer with a price only slightly higher than IBJ's $70 million price so that no one would "lose face" in the negotiations. He suggested that Heller propose a long-term management contract that could later be used as a trade-off for a higher price. Katayama told Heller that a counter-offer of $75 million would preclude IBJ from raising its price to the $80 million range, and without the $80 million range, the excess proceeds would not be available to make the deal work. (FF 86)
 
 
 29
 The district court found that Heller's counter-offer at $71.5 million was made in reliance on Katayama's advice, and that Heller attempted to negotiate in good faith for the highest price possible. (FF 92)
 
 
 30
 About February 8 or 9, 1987, IBJ representatives returned to Hawaii for the face-to-face negotiation sessions. Katayama also returned to "coach" Heller, Covella and Lee on Japanese customs. He explained that personal meetings between the heads of the two entities were not proper Japanese protocol, so when a subordinate of Tamaki arrived at Lee's offices to negotiate, Heller's confidence in Katayama's advice was buttressed. While Covella and Lee negotiated for the Defendants, Heller and Katayama remained in Lee's private offices, caucusing with Lee and Covella during breaks. (FF 97-101) Heller, realizing that IBJ did not want a long-term management contract, was willing to accept a shorter term agreement in exchange for a "walk-away" price of $77.5 million as provided in the January 20, 1987 letter, and expected IBJ to accept the deal based on Katayama's representations. (FF 103)
 
 
 31
 On February 12, 1987, Heller was presented with the final proposal from IBJ. Heller tore it up, threw it on the ground and stomped on it. IBJ offered $69.5 million, a lower figure than any previous offers. (FF 104, 139) The management agreement was also unfavorable to Heller, providing for a maximum three-year term which could be terminated by IBJ at any time, and requiring Heller to guarantee minimum performance and make-up shortfalls. (FF 96)
 
 
 32
 When Heller discovered that the IBJ negotiator had no authority to offer more than $70 million, he realized that all of Katayama's representations that the IBJ chairman had "blessed the deal," that it was "a sure thing", and that IBJ would raise the price at the last minute to get rid of the management agreement, were false. He had Katayama kicked out of the offices. (FF 104-105)
 
 
 33
 Because the deadline was sixteen days away, Heller accepted IBJ's $69.5 million offer and the short-term management agreement. He believed that if he went back to the other potential buyers, they would know the IBJ deal had fallen through and any deal would have been at "distress sale" terms potentially worse than those proposed by IBJ. (FF 106)
 
 B. The District Court's Decision
 
 34
 The district court rejected Katayama's claim that Heller breached an oral contract by not paying Katayama his share of the $2.1 million "finders fee" on the basis of (1) non-occurrance of a condition precedent; (2) equitable estoppel; and (3) violation of Hawaii's real estate licencing requirements. The district court rejected Heller/the Defendants' counterclaim that they were damaged as a result of their reliance on Katayama's misrepresentations.
 
 DISCUSSION
 
 35
 In a federal diversity case, the substantive law is determined by the law of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); accord KL Group v. Case, Kay & Lynch, 829 F.2d 909, 915 (9th Cir.1987). We therefore apply Hawaii law.
 
 A. KATAYAMA'S CLAIM
 
 36
 The district court had three bases for denying Katayama's breach of contract claim, any one of which would be sufficient for this court to affirm. We find that all three bases have been established.
 
 1. Non-Occurrance of a Condition Precedent
 
 37
 The district court held that the January 20, 1987, letter written by Heller to Katayama constituted a partially integrated final agreement between the parties; and, Katayama's commission was conditioned upon Heller's receipt of $77.5 million at closing. (District Court's Decision "Decision" 6, Conclusions of Law "CL" 9) The court based this decision on the express language of the agreement which stated, "[w]e further agree to remit a commission of U.S. $2.1 million to agents in the United States ..., this latter payment to come from the U.S. $77.5 million we are to receive and will be paid at closing." (Decision 6, emphasis added) We concur with the district court's holding that Heller was not obligated to perform because the condition of receiving the $77.5 million had not been satisfied. (Decision 6)
 
 
 38
 We reject Katayama's claim that the January letter was ambiguous and find that the district court arrived at the only reasonable interpretation of the letter. See Sturla Inc. v. Fireman's Fund Ins. Co., 67 Haw. 203; 684 P.2d 960, 964 (1984) (ambiguity exists "only when the contract taken as a whole is reasonably subject to differing interpretation.")
 
 
 39
 We also reject Katayama's argument that Heller demonstrated a bad faith effort to defeat the condition precedent by purposely negotiating for a price below the requisite $77.5 million. See Reality Mart, Inc. v. Aina Alii, Inc., 61 Haw. 526, 530, 607 P.2d 408, 411 (1980). The facts indicate that Heller expected a higher purchase price from IBJ, and made a low-ball counter-offer only because Katayama assured him it would yield a higher final offer. This demonstrates Heller's interest in negotiating a higher, not lower, price. Heller would gain nothing by negotiating for less to avoid paying Katayama, particularly when the agreed price was much more than $2.1 million below the floor amount of $77.5 million.
 
 2. Equitable Estoppel
 
 40
 The Hawaii Supreme Court defined equitable estoppel as follows: "where one by his words, or conduct, wilfully caused another to believe the existence of a certain state of things, and induced him to act on that belief so as to alter his previous position, the former is precluded from averring against the latter a different state of things, as existing at the same time." Anderson v. Anderson, 59 Haw. 575, 587-88, 585 P.2d 938, 946 (1978).
 
 
 41
 The facts of the case demonstrate that Katayama caused Heller to believe and rely on the existence of a condition precedent. Katayama, an experienced attorney, testified that he realized the letter contained an "erroneous" condition precedent, but he only corrected the error "in his mind;" Katayama did not discuss his concerns with Heller (Decision 8); and, Katayama later told Oku that the terms of the January 27th letter were satisfactory. (Decision 8) Thus, Katayama is estopped from denying the existence of a condition precedent in the January 20, 1987, letter because he did not inform Heller of the perceived error.
 
 3. Hawaii Broker's License Requirements
 
 42
 Katayama acted as a real estate broker, as defined by Hawaii Revised Statute § 467-1 (1985)[2], during his participation in the Ilikai sale as evidenced by the following facts. He solicited IBJ and approached Heller with IBJ's offer on January 19, 1987; he discussed negotiation strategies with Heller and Covella the night before their meeting with IBJ on January 26, 1987, and met with Tamaki and Oku that same evening to discuss various deal points; he continued to participate in negotiations from February 1-6, 1987, by advising Heller on the counteroffers he should make, and by advising Heller during the final negotiations in Hawaii from February 10-12, 1987.
 
 
 43
 Since Katayama did not have a Hawaii real estate license, as required by Haw.Rev.Stat. § 467-7[3], he is barred from collecting the fee pursuant to HRS § 487-13. (Decision 4)
 
 
 44
 We reject Katayama's argument that he is not subject to the Hawaii's licensing provisions since his activities were conducted out-of-state. Without reaching Katayama's territorial argument, we find that Katayama's real estate broker activities within Hawaii were sufficient to bring him within the scope of the licensing statute.
 
 2. HELLER'S COUNTERCLAIM
 
 45
 In his counterclaim for fraud, Heller alleges that Katayama induced him to rely on false statements regarding (1) the IBJ Chairman's approval of the Ilikai purchase; (2) the net recovery to the Defendants; and, (3) Katayama's Japanese political connections. He claims that his reliance resulted in damages between $9.2 million and $16 million.
 
 
 46
 The district court rejected Heller's counterclaim holding: (1) Heller did not establish fraud by clear and convincing evidence; (2) Heller failed to show his reliance on Katayama's statements was reasonable, since Heller knew Katayama had a history of breaching fiduciary duties as evidenced by Katayama's bad faith dealings with Gotoh; (3) Heller did not establish the element of proximate cause because he could have entertained other offers to purchase the Ilikai until Katayama's representations were borne out; and, (4) the damage claim was speculative. (Decision 13-14)
 
 
 47
 To establish fraud there must be clear and convincing evidence showing that (1) false representations were made; (2) with knowledge of their falsity; (3) in contemplation of the other party's reliance upon these false representations; (4) which were, in fact, relied upon. Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989). In addition, the injured party must prove he suffered substantial pecuniary damages. Id.
 
 A. Elements of Fraud
 
 48
 The district court found, and we concur, that the first three elements of fraud are met because Katayama knowingly made the following false representations in contemplation of Heller's reliance: (1) on January 19, 1987, Katayama falsely represented that IBJ and its Chairman had decided to acquire the Ilikai at a purchase price in excess of $77.5 million that would net $77.5 million to Heller (FF 119); and (2) Katayama falsely represented that he had direct contacts with IBJ's Chairman Ikeura. (FF 120, 121, 56).
 
 
 49
 The only element at issue is reliance. The district court found that Heller had not established this element because his reliance on Katayama's false representations was unreasonable. (Decision 13)
 
 
 50
 Heller argues that Hawaii has not adopted a reasonableness standard for the reliance element of fraud. In dicta, two cases from the Supreme Court of Hawaii and two cases from the Intermediate Court of Appeals of Hawaii did not modify the reliance element with a reasonableness standard. See Hawaii's Thousand Friends, 70 Haw. at 286, 768 P.2d at 1301 ("The evidence must show that ... (4) plaintiff did rely upon [the false representations]"); Kang v. Harrington, 59 Haw. 652, 587 P.2d 285, 289 (1978) ("it must be shown that ... plaintiff did rely upon [the false representations]"); Wolfer v. Mutual Life Ins. Co. of New York, 3 Haw.App. 65, 641 P.2d 1349, 1353 (1982) ("the plaintiff must show that ... the plaintiff did rely on [the false representations] and suffered damage"); Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp., 6 Haw.App. 125, 712 P.2d 1148, 1158 (1985) ("it must be shown that ... the plaintiff did rely upon the false representations").
 
 
 51
 The single Hawaii case which deals with reliance in a non-dicta setting, applied an "utterly unreasonable" standard to a bizarre scenario. In Stahl v. Balsara, 60 Haw. 144, 587 P.2d 1210 (1978), the Supreme Court of Hawaii denied the plaintiff's fraud claim holding that plaintiff's reliance on a fraudulent fortune-teller was "utterly unreasonable" since it constituted "mere prognostication or prophesy as to the happening of a future events and did not concern an existing material fact". Id. at 1214.
 
 
 52
 This court, in dicta, has interpreted Hawaii law by modifying the reliance element with a "justifiable" standard. Bulgo v. Munoz, 853 F.2d 710 (9th Cir.1988) ("To prove fraud the plaintiff must establish ... the plaintiff justifiably relied upon those false representations to his detriment.") However, this case relied on In Re Hawaii Corp, 567 F.Supp. 609, 630 (D.Haw.1983), a federal district court case which, in turn, relied on Bank of Hawaii v. Allen, 2 Haw.App. 185, 628 P.2d 211, 213 (1981), a Hawaii Intermediate Court of Appeals case which dealt with fraudulent inducement, a contracts cause of action, not common law fraud tort cause of action.
 
 
 53
 Inasmuch as Hawaii courts have not expressly addressed this issue, we must attempt to determine how Hawaii would have decided if it had. Since reasonableness is the traditional reliance standard commonly adopted by other states (see RESTATEMENT (SECOND) OF TORTS § 546 (1977)), we conclude that Hawaii, if presented with the appropriate case, would probably join in adopting such a standard.
 
 
 54
 Applying the reasonable reliance standard, we return to the district court's decision. The court held that Heller's reliance on Katayama's false representations was unreasonable because he knew that Katayama had breached a fiduciary duty to his former client Gotoh. (Decision 13-14) The court implies that such knowledge should have put Heller on notice that Katayama was not to be trusted.
 
 
 55
 The district court's decision that Heller knew of Katayama's double-dealings with Gotoh contradicts its Findings of Fact that Heller did not know Katayama was Gotoh's attorney until pre-trial discovery in the present case (FF 20), and that Katayama's credibility was enhanced by the quality of his counselling during the Gotoh negotiations (FF 33).
 
 
 56
 Moreover, other Findings of Fact indicate that Heller had reason to trust Katayama. The court found that Katayama had "apparent expertise and experience in dealing with Japanese businessmen" which contributed to his credibility with Heller, a novice about such matters. (FF 33). The court also found that Heller and Katayama had engaged in other business dealings (e.g., Katayama made a substantial loan to Heller) which, impliedly, did not give rise to any questions of Katayama's trustworthiness. (FF 33) And, the court expressly found that Heller's confidence in Katayama was "buttressed" when IBJ sent lesser officials to negotiate the final contract, confirming the accuracy of Katayama's assertion that direct negotiations between principles is a breach of Japanese protocol. (FF 100)
 
 
 57
 Heller diligently and repeatedly sought, and received, assurances from Katayama about IBJ and the deal. For example, the district court found that on February 6, 1987, Heller asked Katayama about his Japanese contacts, and Katayama "expressly reconfirmed that the transaction was on track; the Chairman had blessed this deal, it's got to go down." (FF 90)
 
 
 58
 In light of the district court's Findings of Fact, we remand this issue for further findings to support the court's conclusion that Heller's reliance was unreasonable.
 
 B. Substantial Pecuniary Damages
 
 59
 In addition to the four elements of fraud, the injured party must also prove he suffered substantial pecuniary damage. Hawaii's Thousand Friends, 768 P.2d at 1301. This damage must be proximately caused by the fraud ( Chun v. Park, 51 Haw. 462, 51 Haw. 501, 462 P.2d 905, 907 (1969)) and must be established with reasonable certainty ( Tanuvasa v. City and County of Honolulu, 2 Haw.App. 102, 626 P.2d 1175, 1184 (1981)).
 
 
 60
 a) Proximate Cause
 
 
 61
 The Hawaii Supreme Court has "accepted the doctrine of proximate cause to limit liability and damages in tort cases." Chun, 462 P.2d at 907.
 
 
 62
 In the present case, the district court held that Katayama's fraudulent representations were not the proximate cause of Heller's damage because Heller "could have entertained other offers to purchase the Ilikai until [Katayama's] representations were borne out, notwithstanding the impact of IBJ's right to match any offer." (CL 87)
 
 
 63
 Heller argues that uncontradicted trial testimony established that Heller did entertain other offers and did continue to talk to other buyers, but that the potential buyers themselves elected not to proceed upon hearing of IBJ's right-to-match. (Red 25)
 
 
 64
 Heller's contention appears to be supported by the record. Mr. Fannemel, a consultant for Japanese Hotel investors (CT 9/8/89; 72:12-14), testified that he and Joe Onuma were working on a deal whereby Sampo Land Inc., would purchase the Ilikai (CT 9/8/89 90:21-24). Sampo Land, a client of Mr. Onuma, is owned by Yonezo Ozaki (CT 9/8/89 89:22-23).[4]
 
 
 65
 Fannemel and Onumu presented Mr. Ozaki with Heller's requirements for the purchase of the Ilikai (i.e., purchase price of in excess of $80 million) (CT 9/8/89 90:21-24; 91;5-6). Fannemel prepared an offer on behalf of Mr. Ozaki which was approved by Mr. Ozaki ("I got [Mr. Ozaki] to increase the price that he was willing to pay, [from $75 million] up to $80 million, and to agree to the basic terms that we had outlined in this--one, two, third page--the draft" (CT 9/8/89 92:18-21)). Fannemel sent Heller a draft of the offer to make sure there were no additional requirements that needed to be incorporated into the draft before Mr. Ozaki signed (CT 9/8/89 92:23-25; 93:1-3) (see draft letter Heller's ER 203).
 
 
 66
 At the time Fannemel sent the draft of Sampo Land's offer, he was unaware of the arrangements between Mr. Heller and IBJ (CT 9/8/89 95:15-19). Shortly thereafter, Heller informed Fannemel that he was in negotiations with a major financial institution from Japan which had a first right of refusal to buy the Ilikai (CT 9/8/89 96:20-24). When Fannemel told Mr. Ozaki about the other offer with first refusal rights, Mr. Ozaki decided that Sampo Land should not submit the offer (CT 9/8/89 155:24-25; 156:7-11). Fannemel did keep some diaglogue going with Heller on the chance that the IBJ deal might fall through, but basically that was the end of Sampo Land's involvement with the Ilikai (CT 9/8/89 156:7-11).
 
 
 67
 This testimony indicates that Mr. Ozaki had agreed to the terms of the proposed offer, and was about to sign pending Heller's approval of the terms. However, Mr. Ozaki decided not to submit the offer because of IBJ's right of first refusal. The district court's Findings of Fact acknowledged that Sampo Land withdrew a proposal upon learning of IBJ's right-to-match agreement. (FF 107) Fannemel's testimony seems to indicate that "but for" the pending IBJ deal and the right of first refusal extracted by Katayama by his fraudulent statements, the draft offer of $80 million would have been signed by Mr. Ozaki.
 
 
 68
 We remand this issue for further findings in support of the district court's proximate cause Conclusion of Law.
 
 
 69
 b) Speculative Damages
 
 
 70
 The district court also held that Heller's damage claim was too speculative. (Decision 14)
 
 
 71
 Damages which result from a tort must be established with reasonable certainty. Tanuvasa, 626 P.2d at 1184. The United States Supreme Court has held that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927) (emphasis added).
 
 
 72
 Hawaii adopts the restitution principle of damages in fraud cases. Hawaii's Thousand Friends, 768 P.2d at 1301. "The aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded." Id.
 
 
 73
 Heller presented a calculation of restitution damages measuring the difference between what he received from the IBJ deal and what he would have received by selling the Ilikai to Sampo Land at its offering price of $80 million. (Red 31-32)[6]
 
 
 74
 $80.0 Million Sales Price From Sampo
 - 70.0 Million Amount Received ($69 million
 -------------
 purchase price k $500,000 tax
 credit)
Subtotal 10.0 Million Gross Damages
 - 2.4 Million Fannemel's Commission (3%)
 -------------
Subtotal 7.6 Million
 k 1.5 Million Amount Paid to Covella/Others
 -------------
 -------------
TOTAL $ 9.1 Million Net Damages
 
 
 75
 We remand this issue to the district court for further findings as to why Heller's calculation is an unreasonable basis of computation and, thereby, unduly speculative.
 
 CONCLUSION
 
 76
 In conclusion, we AFFIRM the district court's decision denying Katayama's breach of contract claim, and REMAND the court's decision denying Heller's counterclaim for more specific findings on the reasonable reliance, proximate cause and speculative damages issues.
 
 
 
 *
 Honorable Marion J. Callister, Senior United States District Judge for the District of Idaho, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Oku has since assigned his rights to Katayama for $50,000
 
 
 [2]
 HRS § 467-1 provides, in pertinent part:
 "Real estate broker" means and includes any person, ... who for compensation or a valuable consideration, sells or offers to sell, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or lists, or solicits for prospective purchasers, ... any real estate ... as a whole or partial vocation; or who secures, receives, takes or accepts, and sells or offers to sell, any option on real estate without the exercise by the person, copartnership, or corporation of the option and for the purpose or as a means of evading the licensing requirement of this chapter. (Emphasis added.)
 
 
 [3]
 Haw.Rev.Stat. § 467-7 provides, in pertinent part:
 No person within the purview of this chapter shall act as real estate broker ... without a license previously obtained under and in compliance with this chapter and the rules and regulations of the real estate commission.
 
 
 [4]
 This was not the only project Fannemel and Onumu were working on with Sampo Land. They also participated in a $300,000 engineering study for Sampo Land's multi-billion dollar project on reclamation rights in Osaka Harbor (89:1-25)
 
 
 [6]
 We omit other calculations that Heller presented which were arguably speculative