330 F.Supp.2d 1101 (2004)
David MATSUURA, Individually and dba Orchid Isle Nursery, and Stephen Matsuura, Individually and dba Hawaiian Dendrobium Farm, Plaintiffs,
v.
E.I.. DU PONT DE NEMOURS AND COMPANY, a Delaware Corporation, Defendants.
Fuku-Bonsai, Inc., a Hawaii Corporation and David W. Fukumoto, Plaintiffs,
v.
E.I.. du Pont de Nemours and Company, a Delaware Corporation, et al., Defendants.
Living Designs, Inc. and Plant Exchange, Inc., Hawaii Corporations, Plaintiffs,
v.
E.I.. du Pont de Nemours and Company, a Delaware Corporation, Defendants.
McCONNELL, INC., a California Corporation, Plaintiff,
v.
E.I. du Pont de Nemours and Company, a Delaware Corporation, Defendants.
Anthurium Acres, a Hawaii general Partnership, Successor in interest to Island Tropicals; Mueller Horticultural Partners, a Hawaii Limited Partnership, Plaintiffs,
v.
E.I.. du Pont de Nemours and Company, a Delaware Corporation, Defendants,
EI du Pont de Nemours and Company, a Delaware Corporation, Plaintiff/Counterclaim Defendant,
v.
Exotics Hawaii Kona, Inc. and Harvey Tomono, Defendants/Counterclaim Plaintiffs.
Nos. CV96-1180-MLR, CV97-0716-MLR, CV99-0660-MLR, CV00-0328-MLR, CV00-0615-MLR, CV97-1185-MLR.
United States District Court, D. Hawai`i.
June 7, 2004.
*1103 *1104 Ross N. Gushi, Bays, Deaver, Lung, Rose & Baba, James Rodney Veary, Honolulu, HI, Stephen T. Cox, Scott J. Allen, Molligan, Peter N. Molligan, Cox & Moyer, San Francisco, CA, A. Camden Lewis, Mary G. Lewis, Thomas A. Pendarvis, Lewis, Babcock & Hawkins, Columbia, SC, for Plaintiffs.
Judith Ann Pavey, Pavey & Glickstein, Howard Glickstein, Carl H. Osaki, Honolulu, HI, John C. Hentschel, David W. Moyer, Molligan Cox & Moyer, San Francisco, CA, Kris A. LaGuire, Attorney at Law, Hilo, HI, for Plaintiffs and Counter-Defendants.
*1105 Edward A. Moss, Shook, Hardy & Bacon LLP, Miami, FL, Susan C. Yi, Warren Price, III, Robert A. Marks, Terence S. Yamamoto, Price, Okamoto, Himeno & Lum, Lisa W. Munger, Goodsill, Anderson, Quinn & Stifel LLLP, Honolulu, HI, for Defendants.
A. Stephens Clay, William H. Boice, James F. Bogan, III, C. Allen Garrett, Kilpatrick Stockton LLP, Atlanta, GA, Paul T. Reid, Eileen L. Tilghman, Shook Hardy & Bacon LLP, Miami, FL, Mark B. Hutton, Channel P. Townsley, III, Hutton & Hutton, Wichita, KS, Ronald L. Raider, Kilpatrick Stockton LLP, Daniel W. Sigelman, Kellogg, Saccoccia & Sigelman, Washington, DC, Bruce L. Lamon, Goodsill, Anderson, Quinn & Stifel LLLP, Warren Price, III, Robert A. Marks, Price, Okamoto, Himeno & Lum, Kenneth T. Okamoto, Price, Okamoto, Himeno & Lum, Lisa W. Munger, Goodsill, Anderson, Quinn & Stifel LLLP, Riccio M. Tanaka, Melvin Y. Agena, C. Bryan Fitzgerald, Fitzgerald Law Firm, Honolulu, HI, for Defendants and Counter-Claimants.

JUDGMENT
REAL, District Judge.
The Court has reviewed fully the proceedings in each of the motions considered herein and has considered the memorandum submitted by defendant entitled Opinion and Order. It is an accurate and complete review of all the proceedings before the Court involving in excess of six file cabinet drawers of motions and points and authorities. In addition the Court has heard the arguments of counsel on all the issues involved in this litigation. The Court has also considered the objections of the plaintiffs which, in effect, are only a re-argument of their position already considered by the Court in hearings recited herein. The adoption of the memorandum is to accurately recite the facts and the basis for the rulings made in this order.

THE LITIGATION
The following motions are before the Court: (1) "DuPont's Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Based on Litigation Conduct"[1] ("Litigation Conduct Motion"); (2) "DuPont's Motion for Judgment on the Pleadings as to Plaintiffs' RICO Claims"[2] ("RICO Motion"); (3) DuPont's Motion for Summary Judgment on Plaintiffs' Claims Regarding the So-Called `ALTA Fraud'"[3] ("ALTA Motion"); (4) "DuPont's Motion for Summary Judgment on the Speculative Nature of Plaintiffs' Damages"[4] ("Speculative *1106 Damages Motion"); (5) "DuPont's Motion for Summary Judgment on Plaintiffs' Remaining Non-Fraud Claims"[5] ("Non-Fraud Motion"); (6) "Plaintiffs' Motion to Vacate September 4, 2002 Reasonable Reliance Order, Deny Defendant Du Pont's Reasonable Reliance and Litigation Immunity Motions, and Set Case for Consolidated Trial"[6] ("Plaintiffs' Motion to Vacate"); and (7) "DuPont's Counter Motion for An Order Clarifying and Superseding `Order Granting DuPont's Motion for Summary Judgment on Plaintiffs' Inability, As a Matter of Law, to Establish Reasonable Reliance'"[7] ("Counter Motion for a New Reasonable Reliance Order").
This Judgment addresses all seven motions, granting the motions filed by DuPont and denying Plaintiffs' Motion to Vacate. As requested in the Counter Motion for a New Reasonable Reliance Order, this Judgment supersedes this Court's prior "Order Granting DuPont's Motion for Summary Judgment on Plaintiffs' Inability, as a Matter of Law, to Establish Reasonable Reliance," filed September 4, 2002 ("September 4 Order"). As a result of this ruling, the Court dismisses with prejudice all of the claims asserted by the Matsuura Plaintiffs against DuPont, as well as all of the fraud-based counterclaims asserted against DuPont by the defendants/counterclaim plaintiffs in Case No. CV97-01185-MLR/LEK.[8]

I. FACTUAL BACKGROUND
Many of the same undisputed facts are relevant to the different legal issues presented by the various pending motions. This background section sets forth the facts bearing on all of the motions, organized as follows: (a) the underlying cases; (b) the ALTA discovery disputes; (c) the Plaintiffs'[9] settlements and dismissals with *1107 prejudice; (d) post-settlement "discovery fraud" proceedings; and (e) relevant proceedings in these cases, including the certified question proceedings before the Hawaii Supreme Court.
These cases arise from product liability cases filed by the Plaintiffs in 1992 and 1993 against E.I. du Pont de Nemours and Company ("DuPont") relating to their use of the DuPont fungicide known as Benlate(R) ("Benlate"), and which were settled in April, May, and October, 1994. These product liability cases, which were litigated in Hawaii state court, will be referred to as the "Underlying Cases." The Underlying Cases were among other Benlate cases that had been brought against DuPont in federal court in Georgia and state courts in Florida and Hawaii.
With one exception,[10] all of the Plaintiffs were represented in the Underlying Cases by a Florida attorney named Kevin Malone ("Malone"). In the Underlying Cases, as well as other Benlate cases, the Benlate plaintiffs alleged that Benlate was contaminated with an herbicide that damaged their crops and contaminated their lands. Before the underlying cases were settled there were extensive allegations in the Underlying Cases and other Benlate cases around the country that DuPont had engaged in massive discovery abuse and other instances of litigation misconduct. Plaintiffs, particularly their counsel, monitored the other Benlate cases and were, at the time of the settlements, aware of the allegations that had been leveled against DuPont in those other cases.[11]

II. The ALTA Discovery Disputes
Plaintiffs' claims focus to a large extent on scientific testing conducted for DuPont by an outside consultant, ALTA Laboratories ("ALTA"). For various Benlate cases, ALTA analyzed soil and plant samples from Benlate plaintiffs' properties to determine whether a form of herbicide called sulfonylurea ("SU") was present. According to Plaintiffs: (1) certain data generated by ALTA as a result of this testing which was not produced until May 1994 ("the ALTA Data") contained information that Plaintiffs needed to know to evaluate settlement (i.e., the data allegedly showed that the soils of other Benlate plaintiffs were contaminated with SU herbicides manufactured by DuPont); (2) DuPont fraudulently concealed the ALTA Data by claiming that it was protected work product; and (3) assuming the ALTA Data had been disclosed, Plaintiffs would have received significantly more money in their settlements.
The undisputed evidence, however, shows that: (1) prior to Plaintiffs' settlements, their own expert witness had already concluded that ALTA had found SU contamination in Benlate; (2) Plaintiffs knew about the existence of the ALTA Data before they settled with DuPont and did not rely on DuPont's claims of work *1108 product protection but vigorously contested (and ultimately vitiated) those claims; and (3) even after the data were produced in the Hawaii Benlate litigation in May 1994, Benlate plaintiffs continued to settle their claims against DuPont (including Fuku-Bonsai, Inc., a Plaintiff here who was represented by Malone, and Harvey Tomono, a Plaintiff here who was represented by Hawaii attorneys Judith Pavey and Howard Glickstein).
As early as a deposition on February 10, 1994, Plaintiffs' analytical chemistry expert, Dr. Jodie Johnson, testified that, in his opinion, ALTA had found SUs in soil samples removed from the farms of plaintiffs in a Hawaii case (the Kawamata/Tomono case) and a Florida case (the Lambert case). Scott Lieberman, an attorney in Malone's law firm, attended Dr. Johnson's deposition.
At his deposition on March 2, 1994, ALTA scientist Robert Bethern testified about the ALTA Data, which consisted of test data generated in connection with a Benlate case filed in federal court in Georgia (the Bush Ranch case) and additional testing from the Lambert case in Florida. According to Bethem, those test results contained "peaks" in the retention time for some SUs  the same type of information on which Plaintiffs' expert Dr. Johnson had based his opinions during the underlying litigation that ALTA had found SUs.
An expert report prepared by Dr. Johnson and dated March 30, 1994 concluded that, based upon his "review of the [ALTA] analytical test results" then available, "[s]ulfonylurea herbicides have been found in the soil samples taken from the Hawaiian growers' fields, as well as a Florida growers' field" and in "[a]reas of the Benlate facilities at the Belle, W.Va. site ..." Therefore, more than a month before the earliest settlement at issue in these cases, Plaintiffs' own expert had concluded that ALTA's testing showed widespread contamination of Benlate with SUs, which is what Plaintiffs allege was revealed by the ALTA Data that was produced in May 1994.
DuPont objected to the production of the ALTA Data on work product grounds. The undisputed facts, however, show that Plaintiffs did not rely on DuPont's work product designation but instead challenged the objection by moving to compel production of the ALTA Data.
Among other pleadings showing that Plaintiffs challenged DuPont's work product claim over the ALTA Data is a motion to compel dated March 15, 1994, in which Plaintiffs expressly joined. This motion to compel sought the production of ALTA documents identified by Robert Bethem during his March 2, 1994 deposition, and directly attacked DuPont's alleged "litigation strategy" of "cloak[ing] everything with `attorney-client, work product' privilege claims, unless it serve[s] DuPont's purposes...."
In March 1994, after extensive discovery proceedings, the Hawaii state court ordered DuPont to produce the ALTA Data, finding that the Hawaii Benlate plaintiffs had a substantial need for the ALTA Data and that it was therefore not entitled to work product protection. DuPont filed an emergency Petition for Writ of Mandamus in the Hawaii Supreme Court challenging the ruling, but that petition was denied on April 6, 1994. By early April 1994, therefore, it was clear that the ALTA Data would be produced in the Hawaii Benlate litigation, and the documents physically were produced in Hawaii on May 17, 1994.
Most Plaintiffs here executed their settlement agreements in April of 1994, during the final stages of the discovery battle, after the documents were ordered produced but just before they were actually produced on May 17, 1994. Plaintiff Fuku-Bonsai, Inc., however, executed its *1109 settlement agreement on May 25, 1994, after the data had been produced, and other Hawaii clients of Malone continued to execute settlement agreements as late as July 28, 1994. Counterclaim Plaintiff Harvey Tomono settled his claims in October 1994, after his own counsel had obtained production of and made arguments about the ALTA Data in the Hawaii state court proceedings, and after allegations concerning DuPont's alleged ALTA fraud had been publicly made in the Kawamata/Tomono case.
These later settlements show that Plaintiffs did not reasonably rely on the absence of the ALTA Data or on any assumption as to what the data otherwise might disclose. Notwithstanding the disclosures, Malone continued to recommend, administer, arrange for the execution of, and complete the settlements, just as he had done before the ALTA production.
Malone was deposed on June 13-14, 2002. During his deposition, he confirmed that "when we settled we dismissed the cases and whatever ongoing disputes were ongoing were terminated by the termination of the lawsuits." Malone Dep. Tr., at 425. Malone was referring specifically to the discovery disputes concerning the allegedly concealed ALTA Data.

Malone's Expressed Distrust of DuPont
During the underlying litigation, Malone and his experts made assertions about DuPont's trustworthiness and the veracity of its discovery responses. For example, in a letter dated March 23, 1993, one of Malone's retained experts described incomplete discovery responses as a "normal DuPont tactic" and asserted that "the truth and DuPont are really strangers to each other." On September 23, 1993, Malone wrote Wayne Parsons (his Hawaii co-counsel) that two key DuPont witnesses "will lie if needed to protect DuPont."
Malone made similar statements as he began settlement negotiations with DuPont. For example, during a break in the trial of a Benlate case in Florida state court (the KHD v. DuPont case, in which Malone represented the plaintiff), Malone wrote a letter to DuPont's counsel about the possibility of settling his cases in which he stated, "Frankly, I do not trust DuPont ...."

Malone's Statements About Proving Liability
Malone prevailed on liability in the KHD v. DuPont case and in another Florida Benlate case, Fred Henry v. DuPont. On March 23, 1993, Malone wrote to one of his expert witnesses, stating, "At this point, proving that DuPont was negligent in failing to test Benlate and proving that Benlate was defective is not a big problem for us. The fact that the plaintiffs have won six cases in a row demonstrates that we are in good shape in that regard." Similarly, Malone stated in a letter to DuPont that "it will be difficult or impossible in light of the documents and other evidence for DuPont to prevail on the question of liability in regards to Benlate." In other letters written to his clients and DuPont in the fall of 1993 and the early winter of 1994  months before Plaintiffs' settlements  Malone touted his victories in KHD and Fred Henry as proving that he could easily establish Benlate's defectiveness in future cases.

Malone Settled for the "Full Value" of his Clients' Claims
According to a letter Malone wrote to one of his clients in 1996  a letter that was not produced to DuPont until 2002  "I settled the cases under the assumption that we would win liability." At Malone's deposition in June of 2002, he stood by this statement:
Q: Your letter continues: "The big difference between my clients and most of the other plaintiffs is that we, in fact, got full value or very close to full value for our cases *1110 when we settled." Is that statement true in your opinion?
A: I believed it to be true when I wrote this letter.
Q: "As you know, I tried two cases against DuPont and won them both. Accordingly, when I settled all these cases I did it under the assumption that we would, in fact, win the cases if we tried the rest of them." Is that statement true?
A: I believe it was true when I wrote this.
Q: Well, that's true today, isn't it; when you settled the cases you did it on the assumption that you would, in fact, win the cases if you tried the rest of them?
A: Yes.

Malone Dep. Tr., at 450-51 (emphasis added). Malone testified that he arranged to settle the cases to avoid the delays inherent in taking his Benlate cases to trial, not because of the risk he would not prove liability. Id. at 155-156, 342-343, 498-499.

Provisions of the Settlement Agreements
Malone's Hawaii clients executed settlement contracts in April, May, and July of 1994. The release clauses of these settlement contracts provide:
[A]ny and all causes of action, claims, demands, actions, obligations, damages, or liability, whether known or unknown, that [Plaintiffs] ever had, now has, or may hereafter have against [DuPont], by reason of any fact or matter whatsoever, existing or occurring at any time up to and including the date this Release is signed (including, but not limited to, the claims asserted and sought to be asserted in the [Underlying Cases]).
The settlement contracts also contain the following "covenant not to sue":
[Plaintiffs] covenant[ ] that [Plaintiffs] will not commence, prosecute, or permit to be commenced or prosecuted against [DuPont] any action or other proceeding based upon or in any way related to any causes of action, claims, demands, actions, obligations, damages, or liabilities which are the subject of this Release.
Because the covenant not to sue covers any action "based upon or in any way related to" the claims that were the subject of the agreement, the covenant not to sue is broader than the release clause.
The settlement contracts further obliged the Plaintiffs to dismiss the Underlying Cases with prejudice. In late November 1994, after DuPont's payment of the second and final installment of the settlement amounts, dismissals with prejudice were filed in all but one of the Underlying Cases, expressly stating that "[t]here are no remaining parties and/or issues."
On October 19, 1994, Plaintiff Harvey Tomono executed a similar settlement agreement in favor of DuPont, promising not to sue on any claims "based upon or in any way related to" the released claims. Tomono's claims were later dismissed with prejudice on October 28, 1994 through the filing of a dismissal with prejudice that was identical to those filed in the other Underlying Cases.
There is no evidence that DuPont made any misrepresentations in the settlement negotiations between the parties. Furthermore, the Plaintiffs' settlement agreements contain no warranties or promises by DuPont regarding the accuracy or completeness of the information it disclosed or the documents it produced in discovery.

Post-Settlement "Discovery Fraud" Proceedings
In March of 1995, after the production of the ALTA Data in Hawaii and further proceedings in the Hawaii Benlate cases, certain Benlate plaintiffs in the Georgia case styled Bush Ranch v. du Pont initiated a "fraud on the court" proceeding *1111 against DuPont in federal district court, claiming that the ALTA Data should have been produced in that case. See In re duPont  Benlate Litig., 918 F.Supp. 1524 (M.D.Ga.1995), rev'd, 99 F.3d 363 (11th Cir.1996). Around the same time, other Benlate plaintiffs who had been involved in that litigation prepared a draft complaint alleging claims for fraud, federal RICO, and related claims against DuPont for its alleged concealment of the ALTA Data, which they submitted to DuPont by letter dated April 3, 1995.
In the Bush Ranch case, a show-cause proceeding was held in May of 1995. See 918 F.Supp. at 1528. The Bush Ranch case had been the first Benlate case to go to trial (the case was tried and settled in 1993), and the show-cause proceedings were highly-publicized. Malone's clients started asking him whether the "ALTA Fraud" had any impact on their prior settlements. In a letter to Plaintiff Fuku-Bonsai, Inc. dated May 19, 1995, Malone stated that this additional evidence would not have made a difference in the settlements because the settlements were negotiated based on the assumption that his clients would prevail on liability:
I am in receipt of a letter you sent me concerning ongoing litigation concerning DuPont. Succinctly put, I do not think that any of these new developments are of any significance to us. We settled our cases based upon the assumption that we would win our cases. The dollar amounts we settled for represented, in my opinion, full value for the cases. Accordingly, there is no need to consider seeking further damages.
(Emphasis added.)
On August 21, 1995, in a seventy-nine page order, the Bush Ranch district court ruled that DuPont improperly had withheld the ALTA Data and imposed severe sanctions on DuPont, sanctions that were ultimately reversed as having resulted from an unconstitutional process. See 99 F.3d 363. On August 24, 1995, a few days after the Bush Ranch trial court had announced its ruling, Malone wrote to DuPont about the ruling, stating:
Overall my clients have accepted their settlements and have moved on with their lives. However, every time something major hits the newspapers, such as Judge Elliott's recent ruling, a certain number of clients become disgruntled and wish to discuss reopening their cases.
Significantly, at the time the Bush Ranch trial court entered its order, the one-year period for Plaintiffs to move to set aside their dismissals with prejudice for fraud had not yet expired. None of the Plaintiffs, however, sought relief from the prior judgments, nor have they sought to set aside the settlements or the underlying dismissals with prejudice in this litigation. Instead, Plaintiffs now contend that they are "affirming" their settlements and suing DuPont for additional damages for fraud.

The "Costa Rica Testing Fraud" Allegations
Plaintiffs allege claims against DuPont about a Benlate test it allegedly conducted in Costa Rica. According to these "Costa Rica Testing Fraud" allegations, DuPont scientists traveled to Costa Rica to secretly test Benlate on plants, the test went badly for DuPont and the plants died, and DuPont thereafter destroyed the plants and concealed the tests in discovery.[12] *1112 These allegations were made public in the summer of 1996, as the result of discovery motions filed by plaintiffs in a Florida state Benlate case. On September 6, 1996, the first "settlement fraud" case was filed against DuPont in federal district court in Georgia, in which allegations were made about the ALTA Data, the alleged Costa Rica test, and other testing data called the "BAM documents"[13] that are identical to the allegations made in these cases.
Even after this settlement fraud case had been filed against DuPont, Malone continued to insist that additional evidence would not have made a difference in his clients' settlements. As Malone stated in a letter to a client dated September 24, 1996:
... I do not think that it is worthwhile to consider pursuing DuPont for withholding evidence.
* * * * * *
The big difference between my clients and most of these other Plaintiffs is that we, in fact, got full value for our cases when we settled. As you know, I tried two cases against DuPont and won them both. Accordingly, when I settled all these cases, I did it under the assumption that we would, in fact, win the cases if we tried the rest of them. This being the case, these settlements were negotiated giving DuPont perhaps a small discount for the time value of money, but otherwise settling for an amount consistent with what we thought a jury would award when we won the case. Most of the Plaintiffs represented by other lawyers settled their cases for a relatively small fraction of the full value of these cases because their lawyers were not as confident that they would win or were not willing to spend the money necessary to litigate the cases properly.
* * * * * *
... I doubt that we could ever convince a jury that your settlement with DuPont would have been higher if we had known about DuPont's other testing.
(Emphasis added.) With respect to at least some of his clients (including Plaintiff Anthurium Acres), Malone stated that the settlements represented a "windfall":
.... Even though I am quite confident that Benlate caused problems on anthurium farms, we also know full well that a large part of the problems experienced by these farms must be attributed to bacterial blight.... [N]o matter what figures may have been generated concerning the "total losses" of an anthurium farm, we must acknowledge the fact that a jury would have awarded the farmers only some percentage of that total amount because the jury would not give you the amount *1113 of your losses which were attributable to the blight.
To be perfectly honest, I think that the anthurium growers got somewhat of a windfall out of these Benlate cases, because I think the amount that I obtained for you in settlement includes not only damages sustained as a result of Benlate, but also some damages which should have been attributed to the blight.....
(Emphasis added.)
Plaintiffs allege that their underlying attorneys (notably, Malone) were deceived by DuPont's alleged scheme to defraud and that, as a result, the attorneys recommended unreasonably low settlements to them, which they accepted. The undisputed evidence shows, however, that Malone continued to insist that the allegedly concealed evidence would not have made a difference in their settlements and that they had received "full value" in settling their cases, even after the current "settlement fraud" allegations were a matter of public record.

Proceedings in these Cases, Including the Certified Question Proceedings before the Hawaii Supreme Court
On March 8, 2001, in related settlement fraud litigation pending in the United States District Court for the Southern District of Florida, the court granted two motions for judgment on the pleadings filed by DuPont, finding that (1) the litigation immunity barred all of the plaintiffs' state law claims based on conduct during and related to prior litigation; and (2) the plaintiffs' fraud claims failed due to their inability to prove reasonable reliance. See Florida Evergreen Foliage v. Du Pont, 135 F.Supp.2d 1271 (S.D.Fla.2001), aff'd sub nom. Green Leaf Nursery v. DuPont, 341 F.3d 1292 (11th Cir.2003).
DuPont subsequently filed dispositive motions in these cases, raising these same issues. On June 18, 2001, Chief Judge Ezra of this Court certified to the Hawaii Supreme Court the following questions:
1. Under Hawai'i law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?
2. Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law from bringing a cause of action for fraudulent inducement to settle because they should not have relied on the Defendant's representations?
3. Does Hawai'i law recognize a civil cause of action for damages for intentional and/or negligent spoliation of evidence?
Matsuura v. du Pont, 102 Hawai'i 149, 73 P.3d 687, 688-689 (2003). The Hawaii Supreme Court agreed to resolve these questions; its answers to these questions are discussed in detail later in this judgment.

Continuing Discovery Proceedings in These Cases
During the pendency of the certified question proceedings, and at Plaintiffs' urging, discovery and pretrial proceedings continued in these cases.[14] As a result, Plaintiffs were ordered in May of 2002 to produce documents from Malone's files. After this production, Malone was deposed on June 13 and 14, 2002.
Several of the more significant discoveries from Malone's files, such as his letters *1114 to his clients stating that he assumed in settlement negotiations that he could establish liability against DuPont and that he obtained in settlement "full value" for his clients, already have been discussed. Malone's letters also discuss the nature of the opening settlement demands he made on DuPont in settlement negotiations. In one letter, Malone stated:
[I]n going back to my handwritten notes, it appears that my initial settlement demand as to Mueller Horticultural Partners was $6,600,000. My initial demand as to Island Tropicals was $14,000,000. These demands, of course, were very much higher than any number which we had any hope of obtaining. They were just an initial starting point.
(Emphasis added).
During his deposition, Malone testified that, in settling their claims, Plaintiffs relinquished their right to discover additional information from DuPont. Testifying about the ALTA Data, Malone testified as follows:
Q: And then Item e, you also request all Benlate  any ALTA Lab test results for all Benlate litigations cases universally; correct?
A: Yes.
Q: And this is a request that you submitted in April of 1994; correct?
A. Yes.
Q. April 11th; correct?
A. Yes.
Q. Now, I understand you settled these cases that are listed on this Exhibit 35 as well as all of your other cases in or about April 22nd, or so, of 1994; correct?
A. Yes.
Q. And when you settled those cases did you cease seeking the production of documents in discovery in all those cases?
A. Yes, once we settled we stopped the discovery process.

* * * * * *
Q. In any event, it was clear that you did not expect any documents or any information produced in response to your Request to Produce in the Far West case after you settled those cases?
A. Correct.

Q. And to the extent you had discovery requests outstanding in any of your cases, those discovery requests were ended by your settlement of those cases?
A. Yes.

Q. And to the extent you had any discovery disputes about whether documents were owed to you in any of those cases, those discovery disputes were, likewise, ended by your settlement?
A. Yes.

Malone Dep. Tr., at 415-416 (emphasis added). This testimony confirms that the settlements discharged DuPont's obligations to produce information and any discovery claims relating to the information.
During his deposition, Malone articulated reasons why the concealed evidence would have, in his view, enhanced the "settlement value" of his clients' cases, including that discovery of the concealed evidence would have created the possibility of his clients obtaining sanctions against DuPont for discovery misconduct. See, e.g., id. at 58-62, 103-106, 121-125, 160-169, 506-512.

Prior Dispositive Rulings
As urged by the Matsuura Plaintiffs, the Court adhered to a pretrial schedule such that the Matsuura Consolidated Cases could be tried later in 2002. Accordingly, *1115 the Court considered and ruled upon dispositive motions filed by the parties, including the reasonable reliance motion filed by DuPont that had given rise to the reasonable reliance issue certified to the Hawaii Supreme Court.
In the September 4 Order, this Court granted DuPont's reasonable reliance motion, finding the following facts to be undisputed:
In the Underlying Cases, as well as the other Benlate cases, the plaintiff growers alleged that Benlate was contaminated with an herbicide that damaged their crops and soil. The Underlying Cases settled. Around the time of settlement, there were extensive allegations in the Underlying Cases and other Benlate cases around the country that DuPont had engaged in discovery abuses. Plaintiffs here were monitoring many of these other Benlate cases pending in the country.
The alleged abuses included DuPont's failure to disclose unfavorable scientific information it had obtained as well as certain affirmative misrepresentations. These alleged abuses took place from 1992, prior to the filing of the Underlying Cases, and continued during and past the time that the Underlying Cases settled and were dismissed with prejudice. These allegations are detailed in the parties' papers, but a few matters bear mentioning here.
In Bush Ranch ..., DuPont allegedly failed to disclose data from a study performed by ALTA Laboratories. The ALTA data included information showing sulfonylurea herbicide contamination from DuPont in the Bush Ranch plaintiffs' soil. Additionally, in certain of the Hawaii state court cases, including Kawamata v. UnitedAgri Products, CV 91-437, and Tomono v. DuPont, CV 92-247, ("Kawamata/Tomono"), DuPont claimed work product privilege protection for the ALTA data, despite having previously waived the privilege. When DuPont was finally on the verge of having to turn over the ALTA data, Plaintiffs settled their Underlying Cases.
Prior to the time Plaintiffs dismissed their cases with prejudice, there were rampant discovery abuse allegations against DuPont in the Benlate cases monitored by Plaintiffs.....
Sept. 4 Order, at 2-3.
Based on these undisputed facts, the Court ruled as follows:
The problem with Plaintiffs' argument is that Plaintiffs, as well as other Benlate plaintiffs across the country of whom Plaintiffs were aware, had been accusing DuPont of dishonest discovery responses prior to the date the Underlying Cases settled. Plaintiffs did not insist on a warranty in their settlement agreements or any other kind of assurance at the time of settlement. Instead, Plaintiffs chose to turn a blind eye to the glaring allegations of discovery misconduct. Even assuming Plaintiffs actually relied on DuPont's misrepresentations, such reliance could not have been reasonable as a matter of law.
Id. at 7.
The Court also granted a motion by DuPont for summary judgment on limitations grounds on several of the Plaintiffs'[15] federal RICO claims, ruling as follows:
Plaintiffs and their lawyers were on notice of the alleged ALTA testing fraud that forms the basis of their RICO claims as early as late 1993, and by various dates throughout 1994, when *1116 they were themselves litigating discovery fraud issues in their underlying Benlate cases. This Court need not determine whether Plaintiffs' RICO claims accrued on these earlier dates, however, because by August 21, 1995  when Judge Elliott issued his widely-publicized ALTA sanctions ruling against DuPont in the Bush Ranch case  any reasonable Benlate plaintiff was placed on constructive notice of a potential "settlement fraud" claim.
Order Granting DuPont's Mot. for Summ. J. as to Plfs.' RICO Claims Based on the Statute of Limitations, at 12 ("RICO Limitations Order"). This Court further ruled in the RICO Limitations Order that the accrual of Plaintiffs' federal RICO claims was not affected by Plaintiffs' alleged discovery of another fraud:
Plaintiffs argue that their alleged discovery, in 1996, of facts giving rise to another fraud (the so-called Costa Rica testing fraud) saves their RICO claims. See Plaintiffs' CSOF 2. This argument is without merit. Plaintiffs allege but one RICO injury  a reduced settlement payment in 1994. The mere fact that one of the alleged predicate acts may have been discovered within the four-year limitations period does not render timely an otherwise stale RICO claim. Klehr [v. A.O. Smith Corp.], 521 U.S. [179,] 190, 117 S.Ct. 1984, 138 L.Ed.2d 373 [(1997)] (a RICO plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.").
Id. at 15-16.

The Hawaii Supreme Court Answers the Certified Questions
In Matsuura v. du Pont, 102 Hawai'i 149, 73 P.3d 687 (2003), the Hawaii Supreme Court answered or otherwise addressed the three certified questions.
On the reliance question, the Supreme Court ruled, as this Court had found in its September 4 Order, that "under Hawai'i law, to prevail on a claim of fraudulent inducement, plaintiffs must prove that their reliance upon a defendant's representations was reasonable." Id. at 700-701. The Hawaii Supreme Court, however, refused to adopt a "bright line" reasonable reliance rule. It rejected DuPont's argument, based on Florida Evergreen Foliage v. DuPont, 135 F.Supp.2d 1271 (S.D.Fla.2001), aff'd sub nom. Green Leaf Nursery v. DuPont, 341 F.3d 1292 (11th Cir.2003), that a settlement fraud claimant can never show reasonable reliance if the settled dispute included accusations of fraud or dishonesty. The Hawaii Supreme Court also rejected Plaintiffs' argument that reliance on an attorney's representations is per se reasonable. Id. at 701-704.
The Hawaii Supreme Court answered the certified question in the negative:
Considering the policies raised and the arguments advanced by the parties, we are persuaded that reasonable minds could differ as to the reasonableness of the Matsuuras' reliance upon DuPont's representations. Therefore, we submit the following answer to the second certified question:
In an action for fraudulent inducement where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior dealings, plaintiffs are not precluded as a matter of law from establishing that their reliance on the defendant's representations was reasonable.
Id. at 704.
The Hawaii Supreme Court did not, however, resolve the issue of whether the Plaintiffs had presented evidence sufficient to get to a jury under Federal Rule of Civil Procedure 56. As is typical in the *1117 certified-question context, the Hawaii Supreme Court applied facts "derived primarily" from the district court's certification order, which summarized the facts to place the legal issues in context. Id. at 689 n. 3.
On the spoliation question, the Hawaii Supreme Court refused to decide whether Hawaii would recognize a separate spoliation tort, because the destruction of plants in Costa Rica, as alleged by Plaintiffs, did not establish an "inability to prove" the underlying lawsuits due to spoliation, as required for spoliation in those jurisdictions recognizing the tort:
In their underlying lawsuits, the Matsuuras alleged damages from the use of Benlate. Thus, in order to constitute a valid claim of spoliation of evidence, the Matsuuras must prove that the destruction of the plants from the Costa Rica field test resulted in their inability to prove that Benlate damaged their plants and fields. However, the Matsuuras indicate that documents and other information pertaining to the Costa Rica field test  including photos and videotape of the plants  demonstrated the harmful effects of Benlate. Additionally, the Matsuuras indicate that the Alta test results and the Keeler documents both indicated that Benlate was contaminated with herbicides. Moreover, the plaintiffs in Kawamata Farms were successful in proving substantially identical claims without the benefit of any evidence from the Costa Rica field test. Therefore, given that the Matsuuras' allegations indicate that evidence other than the plants from the Costa Rica field test demonstrated the harmful effects of Benlate, the destruction of the Costa Rica plants did not result in their inability to prove their suit.
Id. at 706 (emphasis in original).[16]
On the litigation privilege question, the Supreme Court ruled that the privilege does not preclude allegations of fraud. 73 P.3d at 692-700. The court did not, however, reject the privilege as to non-fraud claims. Id. at 693-697.

Post-Hawaii Supreme Court Motions
After the Hawaii Supreme Court issued its ruling, the Matsuura Plaintiffs moved to vacate the September 4 Order and for an order denying the Litigation Conduct Motion. DuPont filed a Counter Motion that (1) requested the entry of a new reasonable reliance order to supersede the September 4 Order; (2) re-cast its Litigation Conduct Motion to seek the dismissal of Plaintiffs' non-fraud claims on grounds of the litigation privilege; and (3) requested rulings on other pending dispositive motions, including the Litigation Conduct Motion, RICO Motion, the ALTA Motion, and the Non-Fraud Motion (which motions were, at the time, under advisement), as well as DuPont's Speculative Damages Motion.
Plaintiffs' Motion to Vacate, DuPont's Counter Motion for a New Reasonable Reliance Order, and DuPont's Speculative Damages Motion were heard by the Court on February 25, 2004. After argument on the respective motions, the Court announced its rulings. At the close of the hearing, the Court announced rulings on the other motions (the Litigation Conduct Motion, the RICO Motion, the ALTA Motion, and the Non-Fraud Motion).

*1118 III. SUMMARY JUDGMENT STANDARD
Rule 56(c) provides that summary judgment shall be entered when the materials on file "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating to the Court that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although courts view the evidence and make any inferences in the light most favorable to the party opposing summary judgment, Diaz v. AT & T, 752 F.2d 1356, 1362 (9th Cir.1985), the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. Celotex, 477 U.S. at 322, 106 S.Ct. 2548.
Once the movant has met its burden, the opposing party must come forward with specific facts showing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will discredit the movant's evidence. T.W. Elec. Serv., Inc. v. Pacific Elec. Contr. Ass'n, 809 F.2d 626, 630 (9th Cir.1987). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (evidence should be viewed "through the prism of the substantive evidentiary burden").

IV. ANALYSIS
The legal bases for the Court's rulings on the various motions overlap in significant respects. This legal discussion first addresses Plaintiffs' fraud-based claims, followed by a discussion of their "non-fraud" claims, although some of the issues discussed with respect to the fraud-based claims (e.g., the issue of speculative damages) apply to all of Plaintiffs' claims. Finally, the Court addresses the issues unique to the federal RICO claims.

Plaintiffs' Fraud Claims
In Matsuura, the Hawaii Supreme Court restated the essential elements of a fraudulent inducement claim under Hawaii law:
To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage.....
... [U]nder Hawai'i law, to prevail on a claim of fraudulent inducement, plaintiffs must prove that their reliance upon a defendant's representations was reasonable.
Matsuura, 73 P.3d at 700-701 (internal quotation marks, alterations, and citations omitted). Furthermore, every element of fraud claim must be established by "clear and convincing evidence." Shoppe v. Gucci America, Inc., 14 P.3d 1049, 1067 (2000); see also TSA Int'l Ltd. v. Shimizu Corp., 92 Hawai'i 243, 990 P.2d 713, 725-26 (1999).

V. REASONABLE RELIANCE

Plaintiffs Cannot Establish Materiality or Actual Reliance With Respect to the ALTA Data
The undisputed evidence precludes Plaintiffs from establishing either the materiality of or their actual reliance on DuPont's alleged misrepresentations concerning the ALTA Data.
*1119 Under Hawaii law, "the alleged false representation must relate to a past or existing material fact." TSA Int'l, 990 P.2d at 725 (emphasis in original); Stahl v. Balsara, 60 Haw. 144, 587 P.2d 1210, 1213 (1978). In TSA, the Hawaii Supreme Court described the "materiality" element as follows:
The materiality of undisclosed information ... cannot be determined in a vacuum. In business transactions, the alleged undisclosed information must be evaluated in the context in which it was omitted. An omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [claimant].
Id. at 728 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1239 (3d Cir.1993)). In Walter, summary judgment was granted because the plaintiffs did not show that the misrepresentations and omissions "would have been material to their decision to sell their partnership interest." Id. at 730 (citing 985 F.2d at 1236).
Similarly, in TSA, the concealed information was not material in light of other information available to the plaintiff:
TSA has not shown that the information contained in the undisclosed appraisals was unique or unavailable through other sources, or that the undisclosed materials were more reliable than those obtained by TSA. The record indicates that TSA requested and obtained a "comprehensive research and analysis" regarding the value of the Hotel. This analysis was prepared by The Halstrom Group, Inc., a real estate consulting and appraisal firm, over two years before the execution of the Basic Agreement.
Id. at 731. Based in part on the "availability of similar information to TSA," the Hawaii Supreme Court affirmed the grant of summary judgment in that case. Id. at 732.
On the issue of actual reliance, a misrepresentation must be proved "upon which the other party relies and acts to his or her damage." Hawaii Community Fed. Credit Union v. Keka, 94 Hawai'i 213, 11 P.3d 1, 18 (2000) (internal quotation marks omitted); accord Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 768 P.2d 1293, 1301 (1989) ("HTF"). In HTF, the Hawaii Supreme Court reversed a jury verdict in favor of a fraud plaintiff (HTF) who alleged that the defendants had made false representations in an advertising campaign, stating as follows:
[T]he evidence revealed that soon after defendants' advertising campaign began, HTF commenced investigation due to its suspicions that defendants were engaging in fraudulent conduct.....
* * * * * *
The record in this case indicates that HTF was immediately suspicious of the representations made in defendants' advertising campaign. There is no evidence indicating that HTF relied on defendants' representations, nor any evidence to show that HTF suffered any pecuniary damages as a result of defendants' misrepresentations.
768 P.2d at 1301.
In Giuliani v. Chuck, 1 Haw.App. 379, 620 P.2d 733 (1980), property buyers (the Guilianis) asserted a fraud claim against the seller's attorney (Mr. Chuck) based on his allegedly fraudulent conduct in preparing closing documents that did not conform to the initial contract. The Guilianis, however, had refused to sign the closing documents and had successfully brought an action to rescind the contract. See id. at *1120 735. Under these facts, they could not establish actual reliance:
We especially find the Guilianis' amended complaint insufficient to allege a cause of action in fraud. The party asserting such a claim must have relied on the claimed misrepresentation. Here, the facts as alleged by the Guilianis establish quite the contrary. Rather than relying on the documents prepared by Chuck or any of his statements, the Guilianis refused to execute the documents and pursued their legal remedies vigorously.
Id. at 738 (citations omitted).
Here, the undisputed facts preclude a finding of materiality or actual reliance on DuPont's alleged misrepresentations concerning the ALTA Data. As in TSA, the information available to Plaintiffs precludes them from showing that the ALTA Data "would have assumed actual significance" in their settlement deliberations. Plaintiffs already had sufficient information for their expert to conclude that ALTA had found SU herbicides in the soils of other Benlate plaintiffs. Furthermore, Plaintiffs were on notice (from the March 2, 1994 deposition of ALTA scientist Bethem) that the forthcoming ALTA Data would provide more information from which their expert could draw that same ultimate conclusion.
Plaintiffs' claim that DuPont fraudulently represented the "work product" status of the ALTA Data likewise fails on reliance and materiality grounds. Plaintiffs did not rely on this designation but challenged it. Furthermore, when the Hawaii trial court overruled DuPont's work product claim, and when, on April 6, 1994, the Hawaii Supreme Court denied DuPont's petition for a writ of mandamus, DuPont's work product claim, even assuming it was fraudulent, was no longer a material representation.
Most of the Plaintiffs elected to settle their claims without awaiting the production of the ALTA Data. Plaintiff Fuku-Bonsai (and other Malone clients), however, continued to agree to settlements after the ALTA Data was produced on May 17, 1994. Plaintiff Harvey Tomono, who was represented by other counsel, did not settle until October 28, 1994, after the ALTA Fraud allegations had been publicly made in the Hawaii Benlate litigation. Moreover, Plaintiffs waited until October and November of 1994 to dismiss their claims with prejudice, months after the ALTA Data were produced and the significance of that information argued in the Hawaii Benlate litigation. In sum, the undisputed evidence shows that Plaintiffs did not rely on DuPont's alleged misrepresentations concerning the ALTA Data and did not consider those representations to be material when they agreed to settle the Underlying Cases.

Plaintiffs Cannot Establish Reasonable Reliance on DuPont's Alleged Misrepresentations
Reliance on a misrepresentation must be reasonable. Matsuura, 73 P.3d at 701 (citing, inter alia, Fujimoto v. Au, 95 Hawai'i 116, 19 P.3d 699, 740 (2000)). In Hawaii, as elsewhere, the reasonableness of a party's reliance can be determined as a matter of law. See TSA Int'l, 990 P.2d at 726 (affirming summary judgment where plaintiff "could not have reasonably relied on" defendant, given facts indisputably known to plaintiff); Stahl, 587 P.2d at 1214 (affirming JNOV on fraud claim where nature of representations made reliance "utterly unreasonable").
The Hawaii Supreme Court's refusal to adopt a "bright line" rule does not preclude summary judgment here. The undisputed evidence, important aspects of which were not made available until after certification to the Hawaii Supreme Court, *1121 shows that Plaintiffs' underlying attorney, Kevin Malone, knew or had notice of many of the alleged facts supporting Plaintiffs' current fraud claims; that he actually possessed or otherwise knew about many of the allegedly withheld documents at the time of settlement; that he was confident he would win his cases against DuPont based on the evidence he already had; that he did not trust DuPont's discovery disclosures or statements by DuPont's attorneys; and that he repeatedly stated that his clients (including Plaintiffs) received "full value" in the settlement of their underlying claims. At the very least, if the information was so important to the plaintiffs' cases they could have waited the few days for implementation of the Court order to produce the documents they now claim were not disclosed.
The Court has considered, and rejects, Plaintiffs' argument that summary judgment on reasonable reliance grounds is inconsistent with Matsuura. While the Hawaii Supreme Court held that a settlement fraud claim is not barred as a matter of law if there were allegations of fraud and dishonesty in the settled litigation, the undisputed evidence here goes far beyond such allegations. The Hawaii Supreme Court, acting as it did as a state supreme court on certified questions, did not analyze the evidence but instead relied on the district court's factual summary. It is well-settled that the determination as to whether parties have met their respective summary judgment burdens under Federal Rule of Civil Procedure 56 is a matter of federal procedural law. E.g., Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.1994) ("In diversity cases, procedural issues related to summary judgment are controlled by federal law. Federal law alone governs whether evidence is sufficient to raise a question for the trier-of-fact.") (internal quotation marks and citations omitted).
Furthermore, there are significant differences between the record that was before the Hawaii Supreme Court and the record that is now before this Court. The primary evidence submitted by Plaintiffs in opposition to DuPont's original summary judgment motion consisted of the declarations of their underlying attorneys. These declarations were included in the record that was transmitted to the Hawaii Supreme Court. After certification, however, this Court granted DuPont's motion to strike those declarations on federal procedural grounds.[17] Consequently, those declarations have no probative value here.
This Court's striking of the attorney declarations, combined with the submission of significant additional evidence that was not before the Hawaii Supreme Court (notably, the "full value" letters and Malone's deposition testimony), are important distinctions between the records before the two courts. Summary judgment is thus proper on the issue of reasonable reliance.

VI. Plaintiffs' Damages
All tort claims require that damages be proved with reasonable certainty. Therefore, the issue of speculative damages applies to all of the Matsuura Plaintiffs' current claims, whether or not sounding in fraud.
*1122 In Hawaii and elsewhere, a tort plaintiff must establish the "fact of damage" with certainty and cannot recover "speculative" damages. See, e.g., Weinberg v. Mauch, 78 Hawai'i 40, 890 P.2d 277, 287 (1995) ("[I]t is of the essence in an action ... that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses."); Chung v. Kaonohi Center Co., 62 Haw. 594, 618 P.2d 283, 290-291 (1980) (the "fact of damage" must be certain, and the "amount" of damage must be established with "reasonable certainty"); see also Roxas v. Marcos, 89 Hawai'i 91, 969 P.2d 1209, 1259 n. 33 (1998) (collecting cases).
In a fraud case, the plaintiff must show "substantial actual damage" from the alleged fraud:
In order to have a claim based on deceit, the plaintiff must have suffered substantial actual damage, not nominal or speculative. Prosser, Law of Torts, at 748 (3d ed.1964). The courts have often expressed this requirement in terms of pecuniary damage, as does the Restatement of Torts § 519 (1938). The aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded....
Pecuniary damages, being narrow in scope, are those damages (either general or special) which can be accurately calculated in monetary terms such as loss of wages and cost of medical expenses. In fraud or deceit cases, the measure of pecuniary damages is usually confined to either the `out-of-pocket' loss or the `benefit of the bargain' (difference between the actual value at time property is sold and the value it would have had if the representations had been true).... We do not reach the question of which measure is applicable in this case since the plaintiffs do not appear to have alleged any pecuniary loss from the alleged misrepresentations.
Ellis v. Crockett, 51 Haw. 86, 51 Haw. 45, 451 P.2d 814, 820 (1969) (footnotes omitted, emphasis added); HTF, 768 P.2d at 1301. "[P]laintiffs suing in fraud are required to show both that they suffered actual pecuniary loss and that such damages are definite and ascertainable, rather than speculative." Zanakis-Pico v. Cutter Dodge, Inc., 98 Hawai'i 309, 47 P.3d 1222, 1234 (2002); see also W. Page Keeton, et al., Prosser and Keeton on Torts § 110, at 765 & n. 1 (5th ed.1984) ("there can be no recovery if the plaintiff is none the worse off for the misrepresentation, however flagrant it may have been, as where for example he receives all the value that he has been promised and has paid for") (cited in Ellis, 451 P.2d at 820).

The Issue of Speculative Damages in Settlement Fraud Cases
In the "settlement fraud" context, specific rules have developed to ensure that plaintiffs satisfy their burden of proving damages with reasonable certainty. Although some jurisdictions (including California) have rejected all such claims as inherently speculative,[18] the "New York" line of cases allows settlement fraud claims to proceed where the plaintiff can prove both a meritorious underlying claim and that the value of the settled claim exceeded *1123 the amount of the fraudulently-induced settlement.[19] The seminal case on this issue is a 1911 decision by New York's highest court where the defendant had fraudulently induced the settlement of a wrongful death claim for $500:
Fraud and deceit alone do not warrant the recovery of damages. Deceit and injury must concur.
* * * * * *
An alleged value of the claim based upon the accident and the death or facts sufficient to warrant the reasonable belief of the plaintiff that she had a just claim is of a nature too speculative and wagering to be recognized by the law in this action for fraud. The jury in considering the question of damages should first ascertain whether or not the plaintiff was originally entitled to a recovery of some amount. Otherwise they could not determine whether, by executing the release, she parted with value, and, if they could not determine that, they could not decide whether or not she was damaged. Through what method or by what means would they be able to know that the sum of $500 was not equal to the fair value of the right of action until they knew that the right of action had validity and would entitle her to some amount? She was entitled to the fair value of this disputed claim but that value must be ascertained through a rule possessing reasonable certainty and working a reasonably just result. If the jury determine that she was not originally entitled to recover, then their verdict would be for the defendant. If they determine that she was entitled to recover, then they would proceed to measure the damages, and the rule by which they should be guided therein has been clearly expressed by us in Gould v. Cayuga County National Bank, 99 N.Y. 333, 2 N.E. 16. Assuming that the parties meant to avoid litigation and compromise their dispute, and that the true facts and defendant's contradiction of them were disclosed, how much could the plaintiff have reasonably demanded and the defendant reasonably have allowed as s final compromise above and beyond the $500, in fact allowed and received? That the jury must answer.
Urtz v. New York Cent. & H.R.R. Co., 202 N.Y. 170, 95 N.E. 711, 712-13 (1911).[20] Therefore, under this rule, a "settlement fraud" plaintiff must prove not only that the settled claim had merit, but also that the value of the claim exceeded the amount of the fraudulently-induced settlement. This proof must be made by evidence showing damages with reasonable certainty; a subjective valuation of the underlying claim "is of a nature too speculative and wagering to be recognized by the law in this action for fraud." Id. at 713.

Plaintiffs' Claimed Damages
Consistent with the New York rule, the Matsuura Plaintiffs stated in their pre-trial *1124 statement that the proper measure of damages in this case is "the difference between that received under the release and the value of the settlement or recovery achieved had there been no fraud by the released party." See also Ellis, 451 P.2d at 820 ("The aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded."). Plaintiffs have made no effort, however, to prove either the merits of their underlying product liability claims or what those claims would have been worth had their been no fraud by DuPont. Furthermore, while Plaintiffs' damages expert asserts that the missing evidence caused the claims to be undervalued in settlement, he provides no basis for that assertion.[21]
Consistent with his prior letters to his clients, Malone confirmed during his deposition that he settled the cases based on the assumption he could prove liability with the evidence he already had, and further that his clients received "full value" when they settled their product liability claims. Therefore, even assuming the Matsuura Plaintiffs had set out to prove "the difference between that received under the release and the value of the settlement or recovery achieved had there been no fraud by the released party," they would not have been able to prove "fact of damage" with any certainty.[22]
Malone did testify that DuPont's alleged wrongdoing, if known, would have provided him with the opportunity to seek punitive sanctions and punitive damages against DuPont. This, he testified, would have provided him with enhanced bargaining power in the settlement negotiations (presumably to obtain something in excess of "full value" on Plaintiffs' claims). This hypothetical "sanctions threat" cannot be sustained as a legally permissible theory of damages for two reasons.
First, the theory is based not on pecuniary losses caused by the alleged fraud, as required under the legal measure of damages. The theory is based instead on a claim that Plaintiffs were not permitted to reap a windfall based on the exposure of DuPont's alleged wrongdoing prior to the settlements. Absent the wrongdoing, there could have been no sanctions or punitive damages based on the wrongdoing. As Malone testified at his deposition:
Q. If you had requested that ALTA test data in September of 1993, and as soon as you requested it it was produced, there would be no event to be sanctioned; correct?

*1125 A. If they produced it as soon as we requested it I believe you are correct.
Q. So there would be no sanctions in that case?
A. Probably not.
Malone Dep. Tr., at 439-440. Plaintiffs' damages cannot be based on any claim that they would have used the threat of sanctions to negotiate a higher settlement. "The aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded." E.g., Ellis, 451 P.2d at 820.
Second, any effort to translate into a damages theory the unrealized possibility of leveraging, in settlement, the threat of future sanctions requires multiple levels of conjecture and speculation about what trial courts, DuPont and Plaintiffs would each have done and would have done in conjunction with and in reaction to one another. The Matsuura Plaintiffs have not provided the Court with any authorities recognizing such a theory.
DuPont is entitled to summary judgment on all of the Matsuura Plaintiffs' claims due to their inability to prove either the fact or amount of damages with reasonable certainty.

VII. Plaintiffs' Non-Fraud Claims
After the Court entered the September 4 Order dismissing Plaintiffs' fraud-based claims, but prior to the Hawaii Supreme Court's ruling in Matsuura, DuPont moved for summary judgment on Plaintiffs'"non-fraud" claims. Apart from the issues specific to the Matsuura Plaintiffs' federal RICO claims, which are discussed in Section III.C. below, the Non-Fraud Motion raised three grounds for dismissing Plaintiffs' remaining claims: (1) the provisions of the parties' settlement agreements, (2) Plaintiffs' failure to state actionable claims for spoliation, and (3) Plaintiffs' failure to state actionable negligence claims. Also, DuPont's Counter Motion for a New Reasonable Reliance Order re-cast its Litigation Conduct Motion to seek the dismissal of the Matsuura Plaintiffs' non-fraud claims.
Plaintiffs executed their settlement contracts in April, May, and October of 1994. Plaintiffs have retained the settlement proceeds paid to them by DuPont and have affirmed their settlement agreements as binding and effective.

The Settlement Contracts
With the exception of Plaintiff Harvey Tomono's settlement agreement, the release clauses in the settlement contracts provide:
In consideration of Defendant's payment of the Case Settlement Amount ..., Plaintiff hereby releases Defendant [DuPont] from any and all causes of action, claims, demands, actions, obligations, damages, or liability, whether known or unknown, that Plaintiff ever had, now has, or may hereafter have against Defendant, by reason of any fact or matter whatsoever, existing or occurring at any time up to and including the date this Release is signed (including, but not limited to, the claims asserted and sought to be asserted in the [settled] Action).
Tomono's release clause is similar but does not discharge "unknown" claims.
All of the settlement contracts at issue contain the following "covenant not to sue":
Plaintiff covenants that Plaintiff will not commence, prosecute, or permit to be commenced or prosecuted against [DuPont] any action or other proceeding based upon or in any way related to any causes of action, claims, demands, actions, obligations, damages, or liabilities which are the subject of this Release.
The settlement contracts further obliged Plaintiffs to dismiss the Underlying Cases *1126 with prejudice. Those cases were dismissed in October and November 1994.
With the exception of Plaintiff Tomono's agreement, all of the settlement contracts at issue contain Delaware choice-of-law clauses providing that the agreements "shall be governed and construed in accordance with the laws of the State of Delaware." Accordingly, Delaware law governs the construction and effect of those contracts.[23]Matsuura, 166 F.3d at 1008 n. 3; Florida Evergreen, 135 F.Supp.2d at 1277-78. While Mr. Tomono's settlement contract contains no choice of law provision and is therefore governed by Hawaii law,[24] no argument has been advanced that the law of Delaware and Hawaii differs with respect to the construction and effect of settlement agreements.

The Release Clauses
While Delaware fully recognizes the efficacy of a general release of all claims, Hob Tea Room v. Miller, 89 A.2d 851, 856-57 (Del.1952), the Delaware Supreme Court held in the related Florida Evergreen Foliage case that claims for fraudulent inducement of contract are not discharged by a general release, provided that (1) the elements of fraud are proven and (2) the fraud claims were not within the contemplation of the settling parties. Du Pont v. Florida Evergreen Foliage, 744 A.2d 457 (Del.1999).
By definition, non-fraud claims do not satisfy the "fraud exception" articulated by the Delaware Supreme Court. See, e.g., id. at 458-61 (characterizing the issue as "recognizing a fraud exception for general releases"). Therefore, Plaintiffs' non-fraud claims were released.

The Covenants Not to Sue
Plaintiffs' non-fraud claims are also barred by the covenants not to sue, each of which "covenants that Plaintiff will not ... prosecute ... against [DuPont] any action ... based upon or in any way related to any causes of action [or] claims ... which are the subject of" the settlement agreements. Courts in Delaware and elsewhere have ruled that this language embraces any logical or causal connection. See, e.g., Crescott Inv. Assocs. v. Davis, Civ. A. No. 10839, 1989 WL 155469, at *11 (Del.Ch. Dec. 26, 1989) ("related" is broadly defined as "connected by reason of an established or discoverable relation," and "relate to" means "to stand in some relation ...") (internal quotation marks omitted) (citing, inter alia, Webster's Ninth New Collegiate Dictionary (1987)); Hawai'i Laborers' Trust Funds v. Maui Prince Hotel, 81 Hawai'i 487, 918 P.2d 1143, 1150 n. 11 (1996) (law "relates to" an employment benefit plan "if it has a connection with or reference to such a plan") (internal quotation marks omitted) (citing, inter alia, Black's Law Dictionary 1288 (6th ed.1990)); Continental Cas. Co. v. Wendt, 205 F.3d 1258, 1262-64 (11th Cir.2000) ("the common understanding of the word `related' covers a very broad range of connections, both causal and logical") (quoting Gregory v. Home Ins. Co., 876 F.2d 602, 605-06 (7th Cir.1989)). Plaintiffs' current claims exist only because of, and are expressly based on, the products liability claims and the settlement of those *1127 claims. Therefore, Plaintiffs' non-fraud claims are related to the settled claims and are therefore barred by the covenants not to sue.

VIII. Plaintiffs' Spoliation Claim
In Matsuura, the Hawaii Supreme Court refused to decide the issue of whether Hawaii would recognize a separate spoliation tort, because the destruction of plants in Costa Rica, as alleged by Plaintiffs, did not establish an "inability to prove" the underlying lawsuits due to spoliation, as required for spoliation in those jurisdictions recognizing the tort. As stated by the Hawaii Supreme Court:
In their underlying lawsuits, the Matsuuras alleged damages from the use of Benlate. Thus, in order to constitute a valid claim of spoliation of evidence, the Matsuuras must prove that the destruction of the plants from the Costa Rica field test resulted in their inability to prove that Benlate damaged their plants and fields. However, the Matsuuras indicate that documents and other information pertaining to the Costa Rica field test  including photos and videotape of the plants  demonstrated the harmful effects of Benlate. Additionally, the Matsuuras indicate that the Alta test results and the Keeler documents both indicated that Benlate was contaminated with herbicides. Moreover, the plaintiffs in Kawamata Farms were successful in proving substantially identical claims without the benefit of any evidence from the Costa Rica field test. Therefore, given that the Matsuuras' allegations indicate that evidence other than the plants from the Costa Rica field test demonstrated the harmful effects of Benlate, the destruction of the Costa Rica plants did not result in their inability to prove their suit.
73 P.3d at 706 (emphasis in original). All of the Plaintiffs base their spoliation claims on the destruction of plants from the alleged Costa Rica field test. Because all of the Plaintiffs allege that evidence other than those plants proved the harmful effects of Benlate, the destruction of the plants did not result in their inability to prove the Underlying Cases. The Matsuura Plaintiffs' spoliation claims fail as a matter of law.

IX. Plaintiffs' Negligence Claims
An action for negligence requires the violation of a recognized duty of ordinary care running from the defendant to the plaintiff. Dairy Road Partners v. Island Ins. Co., 92 Hawai'i 398, 992 P.2d 93, 114 (2000). No common law duty provides a standard of care for conduct in litigation. Instead, litigation conduct is governed by statute, rules of procedure, and ethical rules.
For a statutory violation to give rise to an actionable negligence claim, the statute must either expressly provide for a cause of action or "manifest an intent on the part of the legislature to impose a duty of care." Hulsman v. Hemmeter Dev. Corp., 65 Haw. 58, 647 P.2d 713, 720 (1982) (actionable claim cannot be based on statute imposing duty on seller of firearm not to sell to a person who is mentally ill); see also Lee v. Corregedore, 83 Hawai'i 154, 925 P.2d 324, 343 (1996) (Veterans Rights and Benefits statute "does not specify standards of conduct on the part of Veterans' Services Counselors necessary to avoid liability for negligence, nor can such standards of conduct be inferred from the chapter's language. The legislative history reveals no intent to create a standard of care...."); Struzik v. Honolulu, 50 Haw. 241, 437 P.2d 880, 885 (1968) (no actionable duty based on statute requiring maintenance of sidewalk areas fronting one's property).
The rules of civil procedure do not create duties on which negligence claims can be based. The Federal Rules of Civil *1128 Procedure were promulgated under the statutory mandate that "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b) (Rules Enabling Act). State procedural rules modeled after the Federal Rules of Civil Procedure, such as Hawaii's, are intended to have the same effect.
Courts consistently reject causes of action predicated on the violation of procedural rules. See, e.g., Jones v. General Motors Corp., 24 F.Supp.2d 1335, 1338 (M.D.Fla.1998) ("discovery violations in other lawsuits cannot form the basis for an independent cause of action"[25]); Rogers v. Furlow, 729 F.Supp. 657, 659 (D.Minn.1989) ("a violation of the Federal Rules of Civil Procedure does not give rise to an independent federal cause of action"); Maiden v. Rozwood, 461 Mich. 109, 597 N.W.2d 817, 830 (1999) ("a breach of duty owed to the court does not give rise to a cause of action in tort by the adverse party"); OMI Holdings, Inc. v. Howell, 260 Kan. 305, 918 P.2d 1274, 1288 (1996) ("the ethics rules do not impose a legal duty on the attorney owing to either a client or a third party"). Hawaii principles are in accord. See Orth v. Basker, 30 Haw. 520 (1928) (rejecting civil liability for perjury: "If she so violated the law, the penalties of perjury available for her punishment; but there is no civil liability for damages in an action for malicious prosecution.").
While Plaintiffs have consistently maintained that fraud claims should be treated differently, such an argument does not apply to negligence. There is no basis for allowing derivative litigation over claims that an opponent's prior litigation conduct in another case amounted to negligence. Plaintiffs' negligence claims are dismissed with prejudice.

X. The Litigation Privilege
While the Hawaii Supreme Court rejected the application of the litigation privilege to allegations of fraud, the court's analysis shows that it did not reject the application of the privilege to non-fraud claims. Matsuura, 73 P.3d at 692-700. The court discussed the "interrelated policies associated with the litigation privilege," recognizing that these policy considerations generally weigh against allowing derivative tort actions. See id. at 693-699. It was only where "fraud" was alleged that the opinion rejected the litigation privilege. Id. at 694 ("in the present case, the defendants are alleged to have fraudulently distorted the evidence presented in a prior proceeding") (emphasis added); id. at 696-697 ("when there is an allegation of fraud, the policy of reinforcing the finality of judgments does not favor limiting liability in a subsequent proceeding") (emphasis added).
Plaintiffs' non-fraud claims, by definition, do not implicate the concerns about fraud articulated by the Hawaii Supreme Court. There is no basis in the ruling to deny DuPont's motion to dismiss non-fraud claims on grounds of the privilege.[26]

XI. The Matsuura Plaintiffs' Federal RICO Claims
As discussed above, Plaintiffs cannot prove that they reasonably relied on DuPont's *1129 alleged fraud. Accordingly, the Matsuura Plaintiffs cannot establish the predicate acts of mail and wire fraud. See Florida Evergreen Foliage v. Du Pont, 135 F.Supp.2d 1271 (S.D.Fla.2001), aff'd sub nom. Green Leaf Nursery v. DuPont, 341 F.3d 1292 (11th Cir.2003). To the extent their federal RICO claims are based on those predicate acts, and as this Court ruled in the September 4 Order, they are dismissed with prejudice.
The federal RICO claims are defective for other reasons as well: (1) the Matsuura Plaintiffs' injury from DuPont's alleged litigation misconduct in the federal Bush Ranch case, a case to which they were not parties, is too indirect to confer RICO standing; (2) the obstruction predicates are insufficient to satisfy RICO's continuity requirements; (3) Plaintiffs impermissibly allege a RICO "person"  DuPont  that is legally indistinguishable from a RICO "enterprise" comprised of DuPont and its agents and employees; (4) Plaintiffs fail to allege an actionable RICO injury; and (5) Plaintiffs' RICO claims are barred by the federal litigation privilege.
Aside from mail and wire fraud, the only other predicate acts supporting the Matsuura Plaintiffs' RICO claims are obstruction of justice and witness intimidation. "[F]ederal obstruction and witness intimidation claims are only applicable to federal proceedings." Florida Evergreen II, 165 F.Supp.2d at 1354 (citations omitted). As for federal proceedings, Plaintiffs' allegations are limited to the Bush Ranch case. The other cases were brought in state courts.
No specific act of witness intimidation in connection with the Bush Ranch case or any other federal case is alleged. The only specific allegations of witness intimidation involve state courts. Plaintiffs' allegations of witness intimidation therefore fail as a matter of law.
With the other predicate acts eliminated, Plaintiffs' RICO claim is confined to the allegation that DuPont obstructed justice in the Bush Ranch case. With respect to this predicate act, however, Plaintiffs have failed to allege "a direct relationship between the injury and the alleged wrongdoing ..." Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc., 241 F.3d 696, 701 (9th Cir.2001). The Southern District of Florida dismissed identical RICO claims as "too remote to satisfy civil RICO's proximate cause requirements," stating as follows:
The parties who were directly injured by DuPont's actions in the Bush Ranch case were the Bush Ranch plaintiffs and the allegedly defrauded court.... Even accepting Plaintiffs' allegations as true and interpreting them in the light most favorable to the Plaintiffs, it is clear that DuPont's actions were directed primarily at the Bush Ranch litigants.
Florida Evergreen I, 165 F.Supp.2d at 1355. The Eleventh Circuit affirmed, rejecting the argument that identically-situated plaintiffs could avoid application of the indirect injury rule merely by alleging that DuPont specifically intended to harm them. Green Leaf, 341 F.3d at 1307-1308; accord Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957 (9th Cir.1999) (applying "remoteness" test to RICO claims by indirect victim).
Plaintiffs' federal RICO claims, as confined to predicate acts of federal obstruction of justice, do not satisfy RICO's proximate cause requirements and therefore fail as a matter of law.
An actionable RICO claim requires a "pattern" of racketeering activity, which is defined as "a series of related predicates extending over a substantial period of time." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 242, 109 S.Ct. 2893, 106 *1130 L.Ed.2d 195 (1989). In H.J., the Supreme Court recognized that this "continuity" requirement would not be satisfied by alleged predicate acts "extending over a few weeks or months and threatening no future criminal conduct." Id. The Ninth Circuit has confirmed that "[a]ctivity that lasts only a few months is not sufficiently continuous." Howard v. Am. Online Inc., 208 F.3d 741, 750 (9th Cir.2000); see also Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 366-67 (9th Cir.1992).
Here, the obstruction predicate acts occurred over a period of less than two months. The earliest predicate act in the Bush Ranch case occurred on or about June 28, 1993 (when DuPont served discovery responses that allegedly failed to disclose the ALTA raw data, the BAM test results, or evidence relating to the alleged Costa Rica field tests). The Bush Ranch case settled  thereby terminating any alleged racketeering activities in that case  on August 16, 1993. In re DuPont  Benlate Litig., 99 F.3d at 365. Thus, Plaintiffs' alleged "pattern" of racketeering lasted only a "few weeks," too short to satisfy RICO's "continuity" requirement. H.J., 492 U.S. at 242, 109 S.Ct. 2893; Howard; 208 F.3d at 750; Wollersheim, 971 F.2d at 366-67.
"The central role of the concept of enterprise under RICO cannot be overstated. It is precisely the criminal infiltration and manipulation of organizational structures that created the problems which led to the passage of RICO." United States v. Neapolitan, 791 F.2d 489, 500 (7th Cir.1986). To make out a claim under 18 U.S.C. § 1962(c), as Plaintiffs attempt to do, requires a showing of RICO "enterprise" that is separate and apart from the pattern of racketeering activity engaged in by the RICO "persons." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).
A RICO "enterprise" is more than a "conspiracy" between "persons," as RICO's severe penalties were not intended to reach "simple conspiracies to perpetrate the predicate acts of racketeering." Chang v. Chen, 80 F.3d 1293, 1299 (9th Cir.1996) (citation omitted). Instead, an enterprise requires "an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583, 101 S.Ct. 2524.
The United States Supreme Court recently reaffirmed this "distinctiveness" requirement:
We do not quarrel with the basic principle that to establish liability under 1962(c) one must allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name ... [T]he person and the victim, or the person and the tool, are different entities, not the same.

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (emphasis added). Notably, while Cedric Kushner had no occasion to resolve the question presented here,[27] it did observe (unanimously) that an enterprise theory in which "the corporation was the person and the corporation, together with all its employees and agents, were the enterprise" is a "less natural" and "oddly constructed" notion of enterprise. 533 U.S. at 204, 121 S.Ct. 2151.
That "oddly constructed" formulation of enterprise is precisely what Plaintiffs allege here. The Amended Complaints allege a single RICO "person": DuPont. Yet the alleged enterprise consists *1131 again of DuPont, along with DuPont law firms, DuPont employees, and DuPont expert witnesses. Plaintiffs' allegations show that the participants in this alleged enterprise were DuPont agents acting "within the scope of their employment" with DuPont. Plaintiffs further allege that the enterprise's objective was to perpetrate "a fraudulent scheme to diminish or extinguish DuPont's legal liability." It was obviously DuPont itself  not some separate enterprise  that faced legal liability in the Benlate litigation.
Plaintiffs' enterprise theory is thus the same as those routinely rejected in cases such as Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339 (2d Cir.1994), in which Riverwoods alleged the existence of an "enterprise" consisting of Marine Midland Bank, its holding company, and its employees. This "enterprise" allegedly committed mail and wire fraud when it restructured certain bank loans. The Second Circuit concluded that there was in fact no "separate" enterprise, just bank employees and agents conducting the bank's affairs. Id. at 344-45; see also Richmond v. Nationwide Cassel, L.P., 52 F.3d 640 (7th Cir.1995) (enterprise requirement not met where pleadings "clearly allege only that the defendants were conducting their own (and each other's) affairs").
The same analysis was applied by the District of Hawaii in Sea-Land Service, Inc. v. Atl. Pac. Int'l, 57 F.Supp.2d 1048 (D.Haw.1999). The Plaintiffs alleged that a corporation (TAG) was both the RICO "person" and the RICO "enterprise." When pressed on the distinctiveness requirement, Sea-Land asserted that TAG conducted alleged racketeering activities with "certain of its employees (and others acting in concert with them)." Id. at 1055-56 (citations omitted). This was insufficient to allege an enterprise. Noting that "a corporate defendant cannot be both the RICO person and the RICO enterprise under section 1962(c)," the Court held that "the inclusion of" the additional entities or individuals "does not save" the RICO claim. Id.
Plaintiffs' RICO claims fail the distinctiveness test and are hereby dismissed.
Federal RICO allows recovery only for "injury" to "business or property," 18 U.S.C. § 1964(c), language that the Supreme Court has found to have "restrictive significance." Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); see also Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The injury Plaintiffs assert  a tainted litigation process that diminished their settlements  is not "injury" to "business or property" cognizable under the RICO statute. Rather, it is the type of personal injury or injury to an intangible interest not remediable by RICO's civil provisions.
Plaintiffs allege that DuPont withheld in litigation data and information that it was obliged to produce. Lacking this data, Plaintiffs allegedly settled their cases for unreasonably low sums. They do not, however, assert injury to their "business," because they are not in the business of litigation. They are in the business of farming and operating nurseries. See Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.2001) (RICO plaintiffs failed to establish injury to "their business or property ..."); Grant, Inc. v. Greate Bay Casino Corp., 3 F.Supp.2d 518, 534 (D.N.J.1998) ("loss of an opportunity to gamble under favorable conditions does not constitute injury to business since plaintiffs are not ... in the business of gambling"), aff'd in part and rev'd in part on other grounds, 232 F.3d 173 (3d Cir.2000).
Nor do Plaintiffs allege an injury to "property." The term "property" in RICO does not encompass any and all monetary *1132 losses. The Ninth Circuit standard requires "proof of concrete financial loss, and not mere injury to a valuable intangible property interest." Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir.1990); see also Imagineering Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1310 (9th Cir.1992); Oscar v. Univ. Students Co-op Ass'n, 965 F.2d 783, 785 (9th Cir.1992) (neither the loss of "peace of mind" nor the devaluation of enjoyment of a leasehold constitutes the type of property interests for which RICO affords recovery); Ove, 264 F.3d at 825 ("right to receive honest services" is not cognizable RICO injury); cf. Cleveland v. United States, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (refusing to interpret "property" expansively under the federal mail fraud statute to include fraudulently obtained government license, noting that other laws expressly govern defendant's conduct).
Under Ninth Circuit precedent, the loss of litigation fair play  the injury alleged here  is damage to an intangible property interest, constituting "only a speculative injury, which is not compensable under RICO." Imagineering, 976 F.2d at 1311. See also Sheperd v. American Honda Motor Co. Inc., 822 F.Supp. 625, 629 (N.D.Cal.1993) (rejecting car dealer's RICO claims alleging conspiracy to divert best-selling vehicles to other dealerships; alleged injury "speculative" because plaintiff "failed to allege a sufficiently concrete financial loss").
Like the tainted bidding process in Imagineering, Plaintiffs' allegedly tainted litigation process is not the tangible sort of harm redressed by RICO. Plaintiffs' allegations therefore fail to allege a cognizable RICO injury and therefore fail as a matter of law.
Plaintiffs' RICO claims are based on DuPont's conduct in Benlate litigation. The federal litigation immunity, however, bars subsequent civil litigation based on a party's litigation conduct. See Briscoe v. LaHue, 460 U.S. 325, 330-31, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) ("The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law"); Holt v. Castaneda, 832 F.2d 123, 125 (9th Cir.1987) (police officer immune from civil liability because of common law immunity afforded to participants in judicial processes); Collins v. Walden, 613 F.Supp. 1306, 1314-1315 (N.D.Ga.1985) (immunity covers all "participants in the process of gathering evidence for use at trial"). See also Franklin v. Terr, 201 F.3d 1098, 1100-02 (9th Cir.2000) (joining the First, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits in rejecting a "conspiracy" exception to the Briscoe immunity rule).
The issue presented here is whether the litigation immunity applies under RICO or whether Congress evinced a "clear legislative intent" to abrogate that immunity. Pulliam v. Allen, 466 U.S. 522, 529, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). The Ninth Circuit Court of Appeals has answered this question. In Chappell v. Robbins, the Ninth Circuit held that "[i]n passing RICO, Congress did not evince a `clear legislative intent' to displace common-law immunities." 73 F.3d 918, 925 (9th Cir.1996).
Chappell involved allegations that a former California state senator had taken bribes from the insurance industry and then sponsored a bill that would allow the industry to extract excessive profits from consumers. Id. at 920. The district court dismissed RICO claims against Robbins upon finding that Robbins' actions fell within the common law legislative immunity. Id. at 919. Upon review, the Ninth Circuit affirmed. Id. at 918. Chappell court further stated:

*1133 We are required by Pulliam to find a clear indication that Congress affirmatively intended to abrogate immunity. Unlike in the statute at issue in Pulliam, here Congress has said nothing on the subject. While Pulliam does not establish an irreducible minimum for how explicit Congress must be in order for us to find an intent to abrogate, Congress must leave us more than tea leaves from which to discern intent.
Id. at 924; see also Cullinan v. Abramson, 128 F.3d 301, 308 (6th Cir.1997) (immunity doctrines are not replaced by "a statute as amorphous as RICO").
Just as Chappell found no Congressional intent for RICO to abrogate legislative immunity, there is no stated or clear Congressional intent to abrogate litigation immunity. Chappell, 73 F.3d at 924. Nor is there any legislative history basis for concluding otherwise.
Plaintiffs' RICO claims, which are based on immune litigation conduct, fail as a matter of law.

THE RULINGS
A. DuPont's Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Based on Litigation Conduct (as subsequently re-cast by DuPont as seeking the dismissal of Plaintiffs' non-fraud claims only), is GRANTED;
B. DuPont's Motion for Judgment on the Pleadings as to Plaintiffs' RICO Claims, is GRANTED;
C. DuPont's Motion for Summary Judgment on Plaintiffs' Claims Regarding the So-Called "ALTA Fraud", is GRANTED;
D. DuPont's Motion for Summary Judgment on the Speculative Nature of Plaintiffs' Damages, is GRANTED;
E. DuPont's Motion for Summary Judgment on Plaintiffs' Remaining Non-Fraud Claims, is GRANTED;
F. DuPont's Counter Motion for An Order Clarifying and Superseding "Order Granting DuPont's Motion for Summary Judgment on Plaintiffs' Inability, As a Matter of Law, to Establish Reasonable Reliance," is GRANTED.
Plaintiffs' Motion to Vacate September 4, 2002 Reasonable Reliance Order, Deny Defendant Du Pont's Reasonable Reliance and Litigation Immunity Motions, and Set Case for Consolidated Trial is hereby DENIED.
Pursuant to this Judgment and Fed.R.Civ.P. 54(b), the Court finds that there is no just reason for delay and hereby directs the entry of judgment, the uncontroverted facts set forth herein and dismissing with prejudice all of the Matsuura Plaintiffs' claims against DuPont.
NOTES
[1] This motion was filed in Fuku-Bonsai, Inc. v. DuPont (Case No. CV97-00716-MLR/LEK) on March 22, 2001; in Matsuura v. DuPont (Case No. CV96-01880-MLR/LEK) on April 19, 2001; in Living Designs, Inc. v. DuPont (Case No. CV99-00600-MLR/LEK), McConnell, Inc. v. DuPont (Case No. CV00-00328-MLR/LEK), and Anthurium Acres v. DuPont (Case No. CV00-00615-MLR/LEK) on March 13, 2002; and heard in all of these cases on June 21, 2002. These cases will be collectively referred to as "the Matsuura Consolidated Cases" and the plaintiffs in these actions will be collectively referred to as "the Matsuura Plaintiffs."
[2] This motion was filed in the Matsuura Consolidated Cases on April 12, 2002 and heard on June 21, 2002.
[3] This motion was filed in the Matsuura Consolidated Cases on April 15, 2002 and heard on June 21, 2002.
[4] This motion was filed in Matsuura v. DuPont (Case No. CV96-01880-MLR/LEK) on July 3, 2002; in Fuku-Bonsai, Inc. v. DuPont (Case No. CV97-00716-MLR/LEK) on September 18, 2002; and in Living Designs, Inc. v. DuPont (Case No. CV99-00600-MLR/LEK), McConnell, Inc. v. DuPont (Case No. CV00-00328-MLR/LEK), and Anthurium Acres v. DuPont (Case No. CV00-00615-MLR/LEK) on October 2, 2002; and heard in all of these cases on February 25, 2004.
[5] This motion was filed in the Matsuura Consolidated Cases on October 1, 2002 and heard on October 29, 2002.
[6] This motion was filed in the Matsuura Consolidated Cases on July 31, 2003 and heard on February 25, 2004.
[7] DuPont filed this motion pursuant to LR 7.9 as a "Counter Motion" to Plaintiffs' Motion to Vacate. This motion was filed in the Matsuura Consolidated Cases, as well as in DuPont v. Exotics Hawaii Kona, Inc. (Case No. CV97-01185-MLR/LEK), on September 16, 2003, and was heard in all of the cases on February 25, 2004.
[8] The following claims have been asserted by the Matsuura Plaintiffs against DuPont and are by this Judgment dismissed with prejudice: (1) fraud, (2) federal RICO (Section 1962(c)), (3) federal RICO (Section 1962(d)), (4) conspiracy, (5) abuse of process, (6) infliction of emotional distress, (7) interference with prospective economic advantage, (8) negligence, (9) spoliation of evidence, and (10) punitive damages. (The Court further notes that the Matsuura Plaintiffs abandoned their claims for abuse of process, infliction of emotional distress, and interference with prospective economic advantage in their Final Pre-Trial Statement filed on July 29, 2002.) With respect to the defendants/ counterclaim plaintiffs in DuPont v. Exotics Hawaii Kona, Inc. (Case No. CV97-01185-MLR/LEK), DuPont's Counter Motion for a New Reasonable Reliance Order is the only motion under consideration in this Judgment dealing with their claims. The Court's order granting the Counter Motion disposes only their fraud-based counterclaims; none of the motions that are the subject of this ruling addresses their non-fraud counterclaims. Finally, DuPont's counterclaims against the Matsuura Plaintiffs, and its affirmative claims in DuPont v. Exotics Hawaii Kona, Inc., for breach of settlement agreement and related claims are not affected by this ruling and remain pending.
[9] With the exception of the defendants/counterclaim plaintiffs in DuPont v. Exotics Hawaii Kona, Inc. (Case No. CV97-01185-MLR/LEK), the plaintiffs in the Underlying Cases are now Plaintiffs in the current cases. For ease of reference, all of these parties will be referred to as "Plaintiffs."
[10] Harvey Tomono, a defendant/counterclaim plaintiff in DuPont v. Exotics Hawaii Kona, Inc. (Case No. CV97-01185-MLR/LEK), was represented in his underlying case by Hawaii attorneys Judith Pavey and Howard Glickstein. Defendant/counterclaim plaintiff Exotics Hawaii Kona, Inc. was represented by Malone.
[11] It is well-settled that the knowledge of Plaintiffs' underlying attorneys is imputed to Plaintiffs as a matter of law. See, e.g., Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 397, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (client is "considered to have notice of all facts, notice of which can be charged on the attorney") (quoting Link v. Wabash Ry., 370 U.S. 626, 633-34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)); Jones Stevedoring Co. v. Director, OWCP, 133 F.3d 683, 689 (9th Cir.1997) (imputation of knowledge from attorney to client is "bedrock" principle of representative litigation).
[12] The undisputed evidence shows that Malone knew that DuPont scientists had traveled to Costa Rica, as shown by a letter he wrote to DuPont accusing it of misconduct during a visit to the property of one of his Costa Rican Benlate clients. Also, two DuPont scientists testified about this trip in a Florida Benlate trial in 1993 (including in one case in which Malone was the plaintiffs' co-counsel). Finally, DuPont identified as an expert witness in one of Malone's Florida state court cases a person (Mr. Leon Vargas) who Plaintiffs now allege was one of the central actors in the alleged Costa Rican Testing Fraud. Although Malone requested to depose Mr. Vargas, Malone never did take his deposition.
[13] Plaintiffs'"BAM" fraud allegations maintain that DuPont failed to produce all testing documents showing that Benlate was allegedly contaminated with triazine herbicides and other alleged contaminants such as "atrazine, simazine, cyanazine, [and] pendamethalin." Malone, however, identified all of these alleged Benlate "contaminants" in his opening statement in the Florida KHD case. Additionally, the Kawamata plaintiffs in the Hawaii Benlate litigation admitted that DuPont had produced the BAM documents to them. DuPont's alleged discovery misconduct was not in failing to produce the documents but in failing to specifically identify the documents in interrogatory responses. Finally, Plaintiffs themselves have admitted in discovery in this litigation that the BAM documents were produced to Malone in at least some of his Florida cases.
[14] DuPont moved to stay all proceedings in these cases pending resolution of the certified questions by the Hawaii Supreme Court. The Matsuura Plaintiffs objected to a stay, insisting that the cases proceed to trial. This Court denied DuPont's motion for a stay.
[15] This motion was filed in the three latest-filed cases, Living Designs, Inc. v. DuPont (Case No. CV99-00600), McConnell, Inc. v. DuPont (Case No. CV00-00328), and Anthurium Acres v. DuPont (Case No. CV00-00615).
[16] This ruling by the Hawaii Supreme Court cited and is consistent with the Southern District of Florida's spoliation ruling in Florida Evergreen Foliage v. DuPont, 165 F.Supp.2d 1345, 1359-1361 (S.D.Fla.2001) (noting that, "[a]t best," the Costa Rica evidence constituted "similar fact evidence" that was "cumulative of the evidence already available to the Plaintiffs"), aff'd sub. nom Green Leaf Nursery v. DuPont, 341 F.3d 1292, 1308-1309 (11th Cir.2003).
[17] When DuPont originally filed its reasonable reliance motion in 2001, and when it re-filed the motion in 2002, Plaintiffs relied heavily on declarations from Malone and his Hawaii co-counsel. DuPont moved to strike the declarations on the ground that they had been submitted in violation of a prior order entered in the Matsuura Consolidated Cases that prohibited these attorneys from testifying as retained experts, due to the Matsuura Plaintiffs' violation of Federal Rule 26(a)(2)(B). See Order Granting in Part and Denying in Part DuPont's Mot. to Preclude Expert Testimony for Violation of Court Order (D.Haw. Mar. 22, 2002).
[18] See, e.g., Taylor v. Hopper, 207 Cal. 102, 276 P. 990 (1929) ("The compromise in the case before us was of a disputed claim, unliquidated in amount, and there is no practicable measure of damages for the action sought to be maintained."); Cedars-Sinai Medical Ctr. v. Superior Court, 18 Cal.4th 1, 74 Cal.Rptr.2d 248, 954 P.2d 511, 519 (1998) ("we have considered the uncertainty of determining hypothetically whether a particular plaintiff would have prevailed on a legal claim as a sufficient reason for refusing to recognize a tort remedy") (citing, inter alia, Taylor).
[19] This line of cases was favorably cited by both the Ninth Circuit Court of Appeals and the Delaware Supreme Court in prior proceedings in this and related litigation. See Matsuura v. Alston & Bird, 166 F.3d 1006, 1008 n. 4 (9th Cir.1999) (favorably citing, inter alia, Slotkin v. Citizens Cas. Co. of N.Y., 614 F.2d 301, 312-314 (2d Cir.1979)) (New York law), and Automobile Underwriters v. Rich, 222 Ind. 384, 53 N.E.2d 775, 777 (1944) (following Gould v. Cayuga Co. Bank, 99 N.Y. 333, 2 N.E. 16, 19 (1885)) and Du Pont v. Florida Evergreen Foliage, 744 A.2d 457, 464-465 (Del.1999) (following DiSabatino v. U.S.F. & G., 635 F.Supp. 350 (D.Del.1986) (following, Slotkin, 614 F.2d at 313, and Automobile Underwriters, 53 N.E.2d at 777)).
[20] The case Urtz v. New York Cent. & H.R.R. Co., 202 N.Y. 170, 95 N.E. 711, 712-13 (1911) was cited by the Matsuura Plaintiffs' damages expert (J. Anderson Berly, III, Esq.) in his supplemental expert report.
[21] The Matsuura Plaintiffs' damages expert, J. Anderson Berly, III, Esq., admitted at his deposition that he employed no method to quantify the materiality of the evidence allegedly withheld by DuPont, but instead relied on a "sixth sense" derived from general trial attorney experience. Furthermore, Berly does not have any knowledge, much less sufficient knowledge under Fed.R.Evid. 702, regarding the facts necessary to support his opinions. Berly's opinion could not survive a Daubert consideration of the testimony.
[22] In their opposition to DuPont's Motion for Summary Judgment on the Speculative Nature of Plaintiffs' Damages, the Matsuura Plaintiffs did not offer any calculation showing their damages under the legal measure of damages. While they introduced verdicts and settlements from certain other Benlate cases that post-dated their settlements, the Court finds that those other verdicts and settlements, which were reached or negotiated as a result of the efforts of other counsel, in other cases, and under different circumstances, are not probative of what the Matsuura Plaintiffs should have received under the legal measure of damages. Furthermore, the information submitted by the Matsuura Plaintiffs on the damages issue has no probative value because it consists of either hearsay or conclusory factual assertions, such as conclusory statements by the Matsuura Plaintiffs as to their alleged damages that are not supported by any calculations or financial data.
[23] As Judge Ezra ruled when he certified questions to the Hawaii Supreme Court, and as the Hawaii Supreme Court's ruling on those questions makes clear, Hawaii law governs Plaintiffs' tort claims. See Matsuura v. DuPont, Civil No. 96-01180, Order Granting Certification of Questions to the Hawaii Supreme Court, etc., at 12-16 (D.Haw. May 24, 2001).
[24] Mr. Tomono's settlement agreement is governed by Hawaii law because that is the state with the most significant relationship to the transaction. UARCO, Inc. v. Lam, 18 F.Supp.2d 1116, 1123 (D.Haw.1998).
[25] "If GM violated discovery rules by failing to produce documents in previous cases, then GM should have been sanctioned by the courts hearing those cases. Plaintiffs in this case do not have a private right of relief for GM's alleged past discovery misconduct." Id.
[26] DuPont's Litigation Conduct Motion and RICO Motion (discussed in the following section) were filed as motions for judgment on the pleadings under Fed.R.Civ.P. 12(c). Judgment on the pleadings is appropriate where, taking all allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law. Nelson v. City of Irvine, 143 F.3d 1196, 1200 (9th Cir.1998).
[27] In Cedric Kushner, a corporation was the enterprise and the corporation's president/sole-shareholder was the liable "person." 533 U.S. 158, 121 S.Ct. 2087.